555 F.2d 1309
 18 Fair Empl.Prac.Cas. 1407, 14 Empl. Prac.
Dec. P 7767
Henry B. AYERS et al., Plaintiffs,
v.
WESTERN LINE CONSOLIDATED SCHOOL DISTRICT et al.,
Defendants-Appellants,
v.
Ms. Bessie B. GIVHAN et al., Plaintiffs-Intervenors Appellees.
 No. 75-3485.
 United States Court of Appeals,
Fifth Circuit.
 July 18, 1977.
 
 J. Robertshaw, Greenville, Miss., for Western, etc.
 James L. Robertson, Greenville, Miss., for Washington, etc.
 Fred Banks, Jr., Nausead Stewart, Phillip J. Brookins, Jackson, Miss, for plaintiffs-intervenors appellees.
 Appeal from the United States District Court for the Northern District of Mississippi.
 Before GEWIN, RONEY and HILL, Circuit Judges.
 GEWIN, Circuit Judge.
 
 
 1
 Mary Butler, Bessie Givhan, and Dolleye Hodges filed suit in district court on their own behalf and on behalf of three classes of black teachers and employees who were discharged or not rehired by the Board of Education of the Western Line Consolidated School District ("school district"), allegedly in violation of the First and Fourteenth Amendments and in violation of the district court order issued pursuant to Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1969) (en banc), rev'd and remanded sub nom. Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), on remand, 5 Cir., 425 F.2d 1211. The district court dismissed the action without prejudice and granted leave to intervene in the instant school desegregation case. After the court granted the defendants'[1] motion to strike the class allegations[2] and dismissed Ms. Butler's action with prejudice on her own motion, the case proceeded to a two-day bench trial. The court concluded that the school district failed to rehire Givhan because of her First Amendment expressions and failed to rehire Hodges in violation of the Singleton order, and it ordered their reinstatement. Defendants appeal under 28 U.S.C. § 1292(a)(1).[3] We reverse and remand.
 
 
 2
 The school district is a rural district encompassing most of Washington County and some of Issaquena County, Mississippi. Prior to desegregation proceedings in the district court it operated three black schools (O'Bannon, Avon, and Moore) and two white schools (Riverside and Glen Allan). Pursuant to Singleton, accelerated by West Feliciana Parish School Board, supra, the district court on January 12 and January 21, 1970, ordered the operation of the school district on a unitary basis after February 9, 1970.[4] Accordingly, the district was reconstituted into one high school and two elementary schools for the second semester of the 1969-70 school year. In the summer of 1970 the desegregation plan was amended to establish attendance centers with grades 1-12 at O'Bannon, Riverside, and Glen Allan. Blacks constituted a majority of the faculty and student body in the district both before and after desegregation. It is undisputed that the school district failed to develop nonracial objective criteria to be used in selecting staff members for dismissal or demotion, as required by the district court's Singleton order in note 4 supra.
 
 
 3
 Appellee Givhan taught English in the junior high grades at O'Bannon from 1963 until her transfer to Riverside for the second semester of 1969-70. She then taught junior high English at Glen Allan during the 1970-71 school year. Appellee Hodges taught fifth grade for nearly four years at Glen Allan until January, 1970. At that time she became certified as a guidance counselor under an "eighteen hour permit," and thereafter she held the position of guidance counselor at Glen Allan. Having received her Master of Education degree in the spring of 1971, Hodges held a "double A" certificate as a guidance counselor during the 1971-72 school year. Beyond these facts, the cases of Givhan and Hodges are best treated separately.
 
 I. Givhan
 
 4
 Givhan was not rehired by the school district for the 1971-72 school year.[5] By letter dated May 1, 1971, Glen Allan principal James Leach notified Superintendent C. L. Morris that Ms. Givhan was not being recommended for re-employment, stating in part:
 
 
 5
 Ms. Givhan is a competent teacher, however, on many occasions she has taken an insulting and hostile attitude towards me and other administrators. She hampers my job greatly by making petty and unreasonable demands. She is overly critical for a reasonable working relationship to exist between us. She also refused to give achievement tests to her homeroom students.[6]
 
 
 6
 Leach testified at trial as to the bases for his recommendation. Leach taught in the district for three years before becoming principal of Glen Allan on October 6, 1970. That school was without a principal for the first several weeks of the 1970-71 school year, and when Leach took the position the school's problems included racial hostility, lack of discipline among the students, and lack of cooperation among the teachers. Shortly after his arrival as principal, Leach solicited greater cooperation at a teachers' meeting. Givhan implied at the meeting that she did not intend to cooperate very much, and Leach later held a private conference with her. Leach testified that at the conference Givhan told him that "she didn't like Western Line District. She didn't like Morris, who was the Superintendent, or anything connected with the system." Givhan denied making these statements.
 
 
 7
 Leach and Givhan had several other encounters during the 1970-71 school year. Leach sent out a memorandum to all teachers reminding them of "six-weeks' tests" to be given on the Thursday and Friday before report cards were to be issued on the following Wednesday. Givhan apparently thought the memorandum was insufficient advance warning; while students were changing classes she discussed (or perhaps argued) with Leach about the inadequate notice and whether she was to give a "pop test." Leach interpreted this challenge to him in front of students as reflecting her antagonism. Givhan in effect admitted the incident, but explained that her concern for timely notice was generated by the memorandum's subject relating to the more comprehensive semester, not six-weeks', tests.
 
 
 8
 Another incident involved administration of a standardized achievement test. According to Leach, Givhan announced at a faculty meeting that she would not give the test, as she thought it was part of Ms. Hodges' job. Leach was later twice informed by Hodges that Givhan still refused to give the test, and he testified that Hodges administered the test. Givhan testified that she may have expressed an intent not to give the test and that she told Leach it was a duty of the guidance counselor. She further testified that on the morning of the test she told Leach she would administer it and that she in fact did so. The latter testimony was corroborated by Hodges and Arcell Jacobs, another Glen Allan teacher at the time.
 
 
 9
 Finally, there was substantial testimony about "demands" made upon Leach by Givhan.[7] Relatively early in Leach's tenure as principal Givhan gave him a list or lists of what he termed "demands" and she termed "requests." These requests all reflect Givhan's concern as to the impressions on black students of the respective roles of whites and blacks in the school environment. She "requested," among other things: (1) that black people be placed in the cafeteria to take up tickets, jobs Givhan considered "choice"; (2) that the administrative staff be better integrated;[8] and (3) that black Neighborhood Youth Corps ("NYC") workers be assigned semi-clerical office tasks instead of only janitorial-type work.
 
 
 10
 Leach felt that these requests were unreasonable and that they therefore manifested, along with the other incidents noted above, Givhan's antagonistic and hostile attitude toward the administration at Glen Allan and the district. According to Leach, the lunchroom ticket-takers were assigned by the district's overall cafeteria supervisor (a white) at the request of the Glen Allan lunchroom manager (a black). Thus, Leach apparently thought that the assignment of lunchroom personnel was not within his power.[9] Givhan's NYC complaint arose from her concern about the impression on black children of a virtually all-white office staff and discrimination she sensed in the assignment of NYC workers. As she explained it, "when I was at Riverside, when we had white NYC workers and black, and whites worked in the office and the blacks washed the windows . . . I was pointing out to Mr. Leach the discrepancies there in the duties." Leach testified that he was ignorant about assignment of NYC workers at other schools, but thought Givhan's request unreasonable because there was no discrimination in his assignments, as the Glen Allan NYC workers were all black, and because NYC workers there were not qualified to do office work and in fact were hired to do janitorial work.
 
 
 11
 In sum, Leach testified that he recommended not rehiring Givhan because of her "arrogance and antagonistic and hostile relationship," manifested in the incidents described above, particularly her "unreasonable demands."
 
 
 12
 Under Mississippi law in effect when the decision was made not to rehire Givhan, teachers had no tenure and teachers had no right to be tendered another contract. Miss.Code Ann. § 37-9-17 (1972); Henry v. Coahoma County Board of Education, 246 F.Supp. 517, 521 (N.D.Miss.1963), aff'd, 353 F.2d 648, 650 (5th Cir. 1965), cert. denied, 384 U.S. 962, 86 S.Ct. 1586, 16 L.Ed.2d 674 (1966). Accordingly, as stated by Judge Roney in Megill v. Board of Regents, 541 F.2d 1073, 1077 (5th Cir. 1976), the school district was entitled not to rehire Givhan for any reason, as long as the decision did not implicate a constitutional right. Thompson v. Madison County Board of Education, 476 F.2d 676, 679 (5th Cir. 1973). Further, because Givhan had no property interest in continued employment into the 1971-72 school year, she had no due process right to a hearing.[10] Robinson v. Jefferson County Board of Education, 485 F.2d 1381-82 (5th Cir. 1973), cert. denied, 419 U.S. 862, 95 S.Ct. 115, 42 L.Ed.2d 97 (1974).
 
 
 13
 As a consequence, appellee does not assert a procedural due process claim, but rather claims of discriminatory treatment, violation of the court's Singleton order, and violation of her right to freedom of speech. The district court ignored the first ground and avoided the second. This avoidance was due to "the court's disinclination to allow its decision on the merits to turn upon the tenuous distinction between the modest expansion of Western Line's teacher staff as defendants maintain was the case, or the very slight reduction for which plaintiffs argue." The district court's principal finding as to Givhan is as follows:
 
 
 14
 (T)he primary reason for the school district's failure to renew Givhan's contract was her criticism of the policies and practices of the school district, especially the school to which she was assigned to teach. In Leach's words, Givhan was not re-hired because she was constantly "making petty and unreasonable demands." The court finds that Givhan's "demands" were not constant; Leach being able to testify specifically as to but two occasions. The court finds that those of Givhan's "demands" as were specifically brought to the court's attention were neither "petty" nor "unreasonable", insomuch as all the complaints in question involved employment policies and practices at Glen Allan school which Givhan conceived to be racially discriminatory in purpose or effect.
 
 
 15
 . . . (T)he school district's motivation in failing to renew Givhan's contract was almost entirely a desire to rid themselves of a vocal critic of the district's policies and practices which were capable of interpretation as embodying racial discrimination. The court conceives this to be a violation of Givhan's rights under the First Amendment to the Constitution of the United States. Perry v. Sindermann, 408 U.S. 593, 33 L.Ed.2d 570, 92 S.Ct. 2694 (1972); Pickering v. Board of Education, 391 U.S. 563, 20 L.Ed.2d 811, 88 S.Ct. 1731 (1968).
 
 
 16
 The proper framework for our analysis was established by the Supreme Court in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). According to Doyle, a plaintiff in a case such as this has the initial burden to show (1) that his conduct was constitutionally protected, and (2) that this conduct was a "substantial factor" or a "motivating factor" in the school board's decision. Id. at 287, 97 S.Ct. at 576, 50 L.Ed.2d at 484. If the plaintiff meets that burden, the board can avoid liability only through proof by a preponderance of the evidence that it would have reached the same decision without regard to the protected conduct. Id. Although not made in terms of Doyle, appellants' argument seems to touch all three bases. Thus, they argue that Givhan's expressions were not constitutionally protected, that her expressions were not a motivating factor in the school board's or Leach's decision, and that the school district had ample reason not to rehire her anyway.
 
 
 17
 As to the district court's findings of fact which conform to the Doyle framework, this court cannot reject them unless they are clearly erroneous. Federal Rule of Civil Procedure 52(a). As to legal conclusions reached by the district court, we are not bound by the "clearly erroneous" rule and we can make independent determinations. United States v. Mississippi Valley Generating Co., 364 U.S. 520, 526, 81 S.Ct. 294, 297, 5 L.Ed.2d 268, 275 (1961). Often this distinction is termed one of questions of fact versus questions of law or versus mixed questions of law and fact. See generally 9 C. Wright & A. Miller, Federal Practice & Procedure § 2588 (1971). This court sometimes has termed the distinction one between questions of subsidiary fact and questions of ultimate fact, best described by Judge Bell in Causey v. Ford Motor Company, 516 F.2d 416, 420-21 (5th Cir. 1975).[11]
 
 
 18
 Applying this distinction to Doyle, the second and third elements whether the teacher's conduct or expression was a motivating factor in the Board's decision and whether the Board would have reached the same decision anyway are primarily questions of subsidiary fact to which the clearly erroneous rule applies. It is hard to conceive of issues that usually involve more credibility and other evaluative choices than what motivated someone and what the person would have done absent that motivation. The district court found that Leach and the Board were motivated primarily by Givhan's "demands" in deciding not to rehire her. That finding is not clearly erroneous. The court did not make an express finding as to whether the same decision would have been made, but on this record the appellants do not, and seriously cannot, argue that the same decision would have been made without regard to the "demands." Appellants seem to argue that the preponderance of the evidence shows that the same decision would have been justified, but that is not the same as proving that the same decision would have been made. In support of this argument appellants rely, inter alia, on several incidents from the 1969-70 school year. See n. 7 supra. There is no evidence that Leach or the Board relied on these incidents or were concerned about them in 1971. Reliance on these incidents becomes even more attenuated when it is noted that Givhan's principal at Riverside and the Board were aware of them yet rehired her for the 1970-71 school year. Therefore appellants failed to make a successful "same decision anyway" defense.
 
 
 19
 The first element of the Doyle standard, whether the plaintiff has proved that her conduct was constitutionally protected, is an "ultimate fact" based on subsidiary facts such as who communicated what to whom, when, and in what manner. The district court's findings of these subsidiary facts are not clearly erroneous. Although the testimony is conflicting as to what authority Givhan and Leach each thought Leach had with regard to cafeteria personnel and NYC workers, there is no dispute that she gave him a list of "demands," "requests," or complaints, among which were the references to these two subjects.[12] The question, then, is whether those expressions were constitutionally protected. That is a question of ultimate fact, which we can determine independently. E. g., Causey, supra.
 
 
 20
 Not all expression by a government employee is constitutionally protected. The determination of constitutional protection entails striking "a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State as employer, in promoting the efficiency of the public services it performs through its employees." Doyle, supra at 284 97 S.Ct. at 574, 50 L.Ed.2d at 481-82; Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811, 817 (1968). We often have been called upon to strike that balance.[13]
 
 
 21
 But before doing so we must determine whether on the facts of this case the teacher had a First Amendment interest as a citizen in making complaints to the principal. We have been cited to and have found no cases precisely in point. Here, in effect, a public employee privately voiced complaints and expressed opinions to her immediate superior. There is no allegation or evidence that the decision not to rehire her was due to information communicated in these expressions as to her religion, her associations with others, or her plans to bring her complaints and opinions to public attention.[14] Indeed, the record does not indicate that Givhan ever made public complaints or suggestions through letters to newspapers or periodicals, letters or remarks to the school Board, remarks at public meetings, telephone calls to radio talk shows, distribution of pamphlets, or the like. Without authority precisely in point, we turn to general freedom of speech principles.
 
 
 22
 The free speech clause is designed "to remove governmental restraints from the arena of public discussion." Cohen v. California, 403 U.S. 15, 24, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284, 293 (1971). It is a guarantee to individuals of their personal right "to make their thoughts public and put them before the community." Curtis Publishing Company v. Butts, 388 U.S. 130, 149, 87 S.Ct. 1975, 1988, 18 L.Ed.2d 1094, 1107 (1967). The result is a "marketplace of ideas," in which debate is "uninhibited, robust, and wide open." Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 759, 96 S.Ct. 1817, 1824, 48 L.Ed.2d 346, 357 (1976); Bond v. Floyd, 385 U.S. 116, 136, 87 S.Ct. 339, 349, 17 L.Ed.2d 235, 247 (1966). A school and the area around it can be a forum for public discussion. Grayned v. City of Rockford, 408 U.S. 104, 118, 92 S.Ct. 2294, 2304, 33 L.Ed.2d 222, 233 (1972); Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731, 737 (1969).
 
 
 23
 Citizens would be deterred from contributing to this public marketplace of ideas if their opportunities for public employment or other public benefits might be adversely affected by their expressions. Consequently, public employment can be denied or terminated on account of the employee's constitutionally protected expression only when the interest of the state as employer and provider of services outweighs the First Amendment interest. Pickering, supra, 391 U.S. at 568, 88 S.Ct. at 1734, 20 L.Ed.2d at 817; see n. 13 supra. The three leading Supreme Court cases on teacher dismissals and freedom of speech illustrate the importance of protecting the right of public expression. In Pickering a teacher was dismissed for sending a letter to a local newspaper that was critical of the way in which the Board and superintendent had handled past proposals to raise new revenues for the schools. The Court, speaking through Justice Marshall, concluded that on the facts of Pickering
 
 
 24
 the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public.
 
 
 25
 391 U.S. at 573, 88 S.Ct. at 1737, 20 L.Ed.2d at 820 (emphasis added).
 
 
 26
 Likewise, in Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), a teacher alleged, inter alia, that he was not rehired in retaliation for his public criticism of the college's Board of Regents. This public criticism appeared in the form of a newspaper advertisement over Sindermann's name and his testimony before committees of the Texas legislature. The district court granted summary judgment, on virtually the pleadings alone, for the defendants, and this court reversed. 430 F.2d 939 (5th Cir. 1970). The Supreme Court affirmed, saying in part:
 
 
 27
 The respondent has alleged that his non-retention was based on his testimony before legislative committees and his other public statements critical of the Regents' policies. And he has alleged that this public criticism was within the First and Fourteenth Amendments' protection of freedom of speech. Plainly, these allegations present a bona fide constitutional claim. For this Court has held that a teacher's public criticism of his superiors on matters of public concern may be constitutionally protected and may, therefore, be an impermissible basis for termination of his employment.
 
 
 28
 Id. at 598, 92 S.Ct. at 2698, 33 L.Ed.2d at 578 (emphasis added).
 
 
 29
 Doyle completes the trilogy. The crucial incident giving rise to Doyle's First Amendment claim was a telephone call he made to a disc jockey at a local radio station conveying the substance of a memorandum relating to teacher dress and appearance circulated by a school principal. The Court accepted the district court's conclusion that this communication was protected by the First Amendment because the Board's "reaction to his communications to the radio station was (nothing) more than an ad hoc response to Doyle's action in making the memorandum public." 429 U.S. at 284, 97 S.Ct. at 574, 50 L.Ed.2d at 482 (emphasis added).
 
 
 30
 The strong implication of these cases is that private expression by a public employee is not constitutionally protected.[15] Recent cases add support to this dichotomy. This Term the Court has held that a state may not, through its public employment relations scheme, restrict the right of teachers to express themselves at a school board meeting open to the public. City of Madison, Joint School District v. Wisconsin Employment Relations Commission,429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976). The state commission found the school district guilty of engaging in negotiations with a member of a bargaining unit other than the exclusive representative by allowing a teacher to speak on an issue related to contract negotiations at a public Board meeting. The Court held this decision to violate the First Amendment:
 
 
 31
 Regardless of the extent to which true contract negotiations between a public body and its employees may be regulated an issue we need not consider at this time the participation in public discussion of public business cannot be confined to one category of interested individuals.
 
 
 32
 Id. at 175, 97 S.Ct. at 426, 50 L.Ed.2d at 385. (Emphasis added). In his concurrence, in which Justice Marshall joined, Justice Brennan expressed the view that "the First Amendment plainly does not forbid Wisconsin from limiting attendance" at a private bargaining session "and denying (teachers) the right to attend and speak at the session." 429 U.S. at 178, 97 S.Ct. at 428, 50 L.Ed.2d at 386. But, he continued:
 
 
 33
 . . . (T)he First Amendment plays a crucially different role when, as here, a government body has either by its own decision or under statutory command, determined to open its decisionmaking processes to public view and participation. (footnote omitted). In such case, the state body has created a public forum dedicated to the expression of views by the general public. . . . The State could no more prevent (the teacher) from speaking at this public forum than it could prevent him from publishing the same views in a newspaper or proclaiming them from a soapbox.
 
 
 34
 Id. at 178, 97 S.Ct. at 428, 50 L.Ed.2d at 387. (Emphasis added).
 
 
 35
 Finally, it should be noted that no one has a right to press even "good" ideas on an unwilling recipient. Rowan v. United States Post Office Department, 397 U.S. 728, 737, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736, 743 (1970) (to hold unconstitutional a statute authorizing addressee to stop mailings of pandering advertisements to him "would hardly make more sense than to say that a radio or television viewer may not twist the dial to cut off an offensive or boring communication"). See also Lehman v. City of Shaker Heights, 418 U.S. 298, 305, 307, 94 S.Ct. 2714, 2719, 41 L.Ed.2d 770, 778, 779 (1974) (Douglas, J., concurring) ("While petitioner clearly has a right to express his views to those who wish to listen, he has no right to force his message upon an audience incapable of declining to receive it.").[16]
 
 
 36
 These general principles lead us to conclude that teacher Givhan did not engage in constitutionally protected speech in her expressions to principal Leach. Neither a teacher nor a citizen has a constitutional right to single out a public employee to serve as the audience for his or her privately expressed views, at least in the absence of evidence that the public employee was given that task by law, custom, or school Board decision. There is no evidence here that Givhan sought to disseminate her views publicly, to anyone willing to listen.[17] Rather, she brought her complaints to Leach alone. Neither is there evidence that the Board or Mississippi law delegated to Leach the task of entertaining complaints from all comers and that he discriminated in choosing to reject her complaints and not to rehire her because she impressed him into such service.
 
 
 37
 It is often said that hard cases make bad law.[18] This could be such a case. Many, if not most people would consider Givhan's expressions laudable. Protection of the First Amendment, however, does not turn on the social worth of ideas. Police Department of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 217 (1972); Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542, 549 (1969); Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131, 1134 (1949). If we held Givhan's expressions constitutionally protected, we would in effect force school principals to be ombudsmen, for damnable as well as laudable expressions. Perhaps it would be wise in terms of education and public employment to encourage anyone interested in public education to express their views and complaints to school principals. That policy, however, is a matter for Mississippi educators, school boards, state courts, and legislative bodies, for in the absence of constitutionally protected rights, federal courts are loathe to intrude into internal school affairs. Bishop v. Wood, 426 U.S. 341, 347-350, 96 S.Ct. 2074, 2079-80, 48 L.Ed.2d 684, 691-693 (1976); Megill v. Board of Regents, supra, at 1077; Blunt v. Marion County School Board, 515 F.2d 951, 956 (5th Cir. 1975).
 
 
 38
 Since Givhan has not prevailed on her First Amendment claim, her case is reversed and remanded for further district court proceedings, including determination of her Singleton claim.[19]
 
 II. Hodges
 
 39
 As noted earlier, appellee Hodges served as guidance counselor at Glen Allan during the second semester of the 1969-70 school year and during the 1970-71 and 1971-72 school years. During the second semester of 1970 and the 1970-71 school year Hodges was one of three guidance counselors employed by the school district. Each was assigned to one of the district's three integrated schools. Ora Kelly (black), the counselor at O'Bannon, was reassigned as an elementary teacher for the 1971-72 school year because she did not qualify for license renewal. James Pollard (white), with the title of the school district's "head counselor" and the counselor assigned to Riverside, resigned at the end of the 1970-71 school year. Neither Pollard nor Kelly was replaced for the 1971-72 school year, leaving Hodges at Glen Allan as the school district's only guidance counselor.
 
 
 40
 District Superintendent Morris in March or April, 1972, decided to abandon the concept of a counselor for each school and instead to hire one counselor for the whole district for 1972-73. Tony Cintgran, a white, eventually was hired for this position. Around March 8, 1972, Hodges learned that Leach was recommending that she not be rehired. Leach and Harold Adams, assistant superintendent, told her that the reasons for the decision included parental opposition and her inability to get along with students.
 
 
 41
 In September, 1972, Hodges was informed of a vacancy in the district and applied to Superintendent Morris for the position. He refused her application, citing (1) her refusal to accept a fourth grade position for 1971-72 and (2) the "letter (Hodges) sent to Atlanta."
 
 
 42
 The latter reference was to Hodges' application to Atlanta University in the spring of 1972. The application had to be accompanied by the written recommendations of the principal and assistant principal. Hodges was not sure how long she had had the necessary forms for the recommendation and rating, but it suddenly dawned on her on Thursday, April 6, that the application was due on Monday, April 10. Since she was leaving on Friday the 7th for a meeting in Jackson, she decided it was imperative that the application be completed promptly. She looked for principal Leach but could not find him. She approached Assistant Principal Givhan, who without knowledge of exactly what she wanted, told her that he was busy and to "get someone else to sign it for you." Hodges did exactly that. She wrote a recommendation, displaying "a lively appreciation of her own worth and abilities,"[20] signed Leach's name to it, filled out the rating blank, and got someone else to sign Ms. Givhan's name to it.
 
 
 43
 Although Hodges was quite contrite about this episode at trial,[21] district officials learned of it only inadvertently. After completing and signing the forms, Hodges got a girl in the library to type the address on the envelope. The envelope was addressed inadequately, and the letter was returned to Leach. Leach apparently sent the letter to Superintendent Morris, who put it in Hodges' file. When Morris brought up the incident at the time she applied for a position in September, 1972, Hodges had difficulty remembering it. Morris refreshed her memory by showing her the letter. She admitted writing it, and Morris rejected her application.
 
 
 44
 The district court again avoided deciding whether there was an overall reduction in faculty positions making the Singleton order applicable. Instead the court thought that the counselor positions themselves were an appropriate group upon which to determine applicability of Singleton. It then concluded that there had occurred a reduction from three to one counselor positions between the 1971-72 and 1972-73 school years. The court acknowledged that Hodges had been the only counselor employed by the school district in 1971-72. However, the court observed that there had in fact been three counselor positions that year, with the district apparently either unable or unwilling to replace Kelly and Pollard. The court found that the district's scheme of employing counselors resulted in there being one instead of three positions in 1972-73, that Singleton therefore applied, and that since the school district did not apply "objective and reasonable non-discriminatory standards" in effecting the reduction, only "just cause" would excuse Hodges' nonretention. The court found no just cause. That finding is not clearly erroneous. Appellants contend that the court erred in applying Singleton.
 
 
 45
 We agree with the district court that the school district was still in the process of becoming a unitary system in 1972, that is, it was still in a Singleton situation. See, e. g., United States v. Coffeeville Consolidated School District, 513 F.2d 244, 247 (5th Cir. 1975); United States v. Texas, 509 F.2d 192, 193 (5th Cir. 1975). By its own terms, however, Singleton applies only "(i)f there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff." Our recent cases establish that not only an arithmetic reduction is required, but a reduction related to desegregation. Hardy v. Porter, 546 F.2d 1165, 1167-68 (5th Cir. 1977) (former principal lost his Singleton protection when he left the system for "reasons unrelated to the desegregation process"); Lee v. Chambers County Board of Education, 533 F.2d 132, 135 (5th Cir. 1976); Pickens v. Okolona Municipal Separate School District, 527 F.2d 358, 361, 362 & n. 3 (5th Cir. 1976). As we said in Lee, supra :
 
 
 46
 Singleton was designed to ensure that the transition from a dual to a unitary system, with all the concomitant logistical problems, would not occasion unfair treatment of black teachers and staff members. Oliver's demotion from the position of Assistant Attendance Supervisor to that of classroom teacher was not a result of the desegregation of Chambers County schools, but rather was necessitated by termination of the Title I funds that paid his salary.
 
 
 47
 A plaintiff seeking Singleton protection has the burden of proving the applicability of its terms. Cf. Hardy v. Porter, supra; Lee v. Chambers County Board of Education, supra. There is no evidence in this record that the reduction in counselor positions was related to desegregation, and the court made no such finding. Since the "desegregation-relatedness" aspect of Singleton may not have been entirely clear when the case was tried, it is appropriate to reverse and remand for further consideration of why the district changed its counselor employment scheme. If that change was not related to desegregation, Singleton would not apply to Hodges regardless of any reduction in the overall faculty related to desegregation, because elimination of her position would not have been so related. Hardy v. Porter, supra.
 
 
 48
 If the district court finds that Hodges was protected by Singleton, reinstatement in this case would be an inappropriate remedy for its violation. Reinstatement is a usual remedy for Singleton violations. See, e. g., McLaurin v. Columbia Municipal Separate School District, 530 F.2d 661, 665-66 (5th Cir. 1976); Ward v. Kelly, 515 F.2d 908, 912 (5th Cir. 1975); Cornist v. Richland Parish School Board, 495 F.2d 189, 191 (5th Cir. 1974). As Judge Godbold noted in Hardy v. Porter, supra, at 1168, the requirements of Singleton are equitable remedies designed to fashion relief for constitutional violations "in accordance with principles of fairness." Consequently, our reinstatement cases have been predicated on the plaintiffs' qualifications as school teachers and administrators. E. g., Kelly v. West Baton Rouge Parish School Board, 517 F.2d 194, 199 (5th Cir. 1975).
 
 
 49
 Also with a view toward equity, "just cause" is a good defense to school district action in violation of Singleton. Thompson v. Madison County Board of Education, 476 F.2d 676, 678-79 (5th Cir. 1973). As we said there,
 
 
 50
 "Just cause" in a Singleton situation means types of conduct that are repulsive to the minimum standards of decency such as honesty and integrity required by virtually all employers of their employees, and especially required of public servants such as school teachers. . . . For example, if a teacher came to school drunk, or was found stealing from the school treasury, or sexually assaulted a student . . ..
 
 
 51
 Although such conduct sometimes may not negate an employer's violation of an employee's rights, for example, because it was not relied upon by the employer in making a decision to discharge or not to rehire, it may preclude reinstatement as a remedy.[22] That is the case here. There is no evidence that Leach or the Board relied on the incident relating to the unauthorized signatures in deciding not to rehire Hodges. After they learned of the incident, however, they rejected her application for a different position in September, 1972. Hodges wrote her own recommendation, signed Leach's name to it, and procured another teacher to sign Mr. Givhan's name on the rating blank, all with knowledge that these actions were not authorized and that the university would rely on the authenticity of the signatures. Such conduct was a type "repulsive to the minimum standards of decency . . . required by virtually all employers of their employees." Thompson v. Madison County Board of Education, supra. Her conduct particularly disqualified Hodges for the sensitive position of guidance counselor to young students.
 
 
 52
 Accordingly, we reverse and remand Hodges' case for further district court consideration of her Singleton claim. We leave to the district court the determination of Hodges' entitlement to attorneys' fees and to damages for the interim between the decision not to rehire her as a counselor and the decision not to consider her future employment because of her conduct in using unauthorized signatures on recommendations in her own behalf.
 
 
 53
 REVERSED and REMANDED.
 
 RONEY, Circuit Judge, specially concurring:
 
 54
 I concur in the result reached by Judge Gewin in this case. I think that there are probably many occasions when First Amendment constitutional protection will reach private expression by a public employee, but I agree that the district court erred in casting this case in the First Amendment terms.
 
 
 
 [1]
 In addition to the school district itself, the school board members, the district superintendent, and principal James Leach were named as defendants
 
 
 [2]
 61 F.R.D. 414, 416 (N.D.Miss.1973)
 
 
 [3]
 The court also ordered the parties to confer about appellees' claims for back pay and attorneys' fees. After staying its reinstatement order pending appeal, the court entered a final judgment fixing the amount of back pay and attorneys' fees. 404 F.Supp. 1225 (N.D.Miss.1975)
 
 
 [4]
 Those orders included, inter alia, the following Singleton provisions:
 (a) Effective not later than February 1, 1970, the principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students. For the remainder of the 1969-70 school year the district shall assign the staff described above so that the ratio of Negro to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system.
 The school district shall, to the extent necessary to carry out this desegregation plan, direct members of its staff as a condition of continued employment to accept new assignments.
 (b) Staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color, or national origin.
 (c) If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion or (sic) any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.
 Prior to such a reduction, the school board will develop or require the development of non-racial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.
 
 
 [5]
 The teacher who replaced Givhan was black
 
 
 [6]
 Superintendent Morris gave his reasons for not rehiring Givhan in a letter to her dated July 23, 1971:
 (1) a flat refusal to administer standardized National tests to the pupils in your charge; (2) an announced intention not to cooperate with the administration of the Glen Allan Attendance Center; (3) and an antagonistic and hostile attitude to the administration of the Glen Allan Attendance Center demonstrated throughout the school year.
 
 
 [7]
 Appellants also sought to establish these other bases for the decision not to rehire: (1) that Givhan "downgraded" the papers of white students; (2) that she was one of a number of teachers who walked out of a meeting about desegregation in the fall of 1969 and attempted to disrupt it by blowing automobile horns outside the gymnasium; (3) that the school district had received a threat by Givhan and other teachers not to return to work when schools reopened on a unitary basis in February, 1970; and (4) that Givhan had protected a student during a weapons shakedown at Riverside in March, 1970, by concealing a student's knife until completion of a search. The evidence on the first three of these points was inconclusive and the district judge did not clearly err in rejecting or ignoring it. Givhan admitted the fourth incident, but the district judge properly rejected that as a justification for her not being rehired, as there was no evidence that Leach relied on it in making his recommendation
 
 
 [8]
 Apparently all of the Glen Allan administrative and office personnel were white except for Ms. Hodges, the guidance counselor, Givhan's husband, who became assistant principal around Thanksgiving, 1970, and a Mr. Jackson. Ms. Givhan did not consider the roles of Hodges, Mr. Givhan, and Mr. Jackson very significant in the overall context of Glen Allan's administration. It should be noted that Mr. Givhan was rehired as assistant principal after Leach's recommendation not to rehire Ms. Givhan
 
 
 [9]
 Givhan's complaint apparently was triggered by the replacement of two black teachers' aides with a white student as ticket-taker. Givhan admitted that the lunchroom manager was black, but was unaware who had authority to assign lunchroom personnel
 
 
 [10]
 There was testimony, however, that the District Board of Education ordinarily granted requests for a hearing by teachers not rehired. Givhan made no such request, and no hearing was held
 
 
 [11]
 There exists, however, a significant distinction for the purpose of applying the clearly erroneous test between findings of subsidiary fact and findings of ultimate fact. See Galena Oaks Corp. v. Scofield, 5 Cir. 1954, 218 F.2d 217, 219-20. Finding a subsidiary fact involves the determination of an evidentiary or primary fact; finding an ultimate fact, on the other hand, "may involve the very basis on which judgment of fallible evidence is to be made." Baumgartner v. United States, 1944, 322 U.S. 665, 671, 64 S.Ct. 1240, 1244, 88 L.Ed. 1525, 1529. Thus, for example, a finding of infringement of a patent is a finding of ultimate fact (citation omitted); as is a finding that a gain should be treated as capital rather than ordinary for income tax purposes (citation omitted). With respect to ultimate findings of fact, furthermore, we noted in Industrial Instrument Corp. v. Foxboro Co. (5 Cir.), supra, 307 F.2d (783) at 786 n. 2:
 We may reverse free of the clearly erroneous rule where . . . the issue revolves around an ultimate fact as distinguished from subsidiary fact questions . . . .
 Although discrimination vel non is essentially a question of fact it is, at the same time, the ultimate issue for resolution in this case . . . . As such, a finding of discrimination is a finding of ultimate fact.
 See also Wade v. Mississippi Cooperative Extension Service, 528 F.2d 508, 516 (5th Cir. 1976) (racial discrimination); Stepp v. Estelle, 524 F.2d 447, 453 (5th Cir. 1975) (intelligent waiver of counsel); East v. Romine, Incorporated, 518 F.2d 332, 338-39 (5th Cir. 1975) (sex discrimination).
 
 
 [12]
 There is some evidence that Givhan subsequently orally reminded Leach of her complaints in private conversation. This reminder and the list constituted the "unreasonable demands" which the court found primarily motivated Leach in his recommendation. This finding seems somewhat inconsistent with the court's characterization of Givhan as a "vocal critic of the district's policies and practices." Perhaps "active" would be a more appropriate adjective than "vocal."
 
 
 [13]
 See, e. g., Abbott v. Thetford, 5 Cir., 534 F.2d 1101, (en banc), rev'g and adopting dissenting opinion, 529 F.2d 695 (5th Cir. 1976), cert. denied, --- U.S. ----, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977), (interference of Chief Probation Officer's expression in the form of a lawsuit with his work relationship with agencies sued justified dismissal by Juvenile Court Judge); Smith v. United States, 502 F.2d 512, 516, 518-19 (5th Cir. 1974) (the possibility of effect on patients of symbolic speech in form of wearing a peace pin constituted substantial interference with duties of wearer as staff psychologist at a Veterans Administration hospital)
 Appellants did not expressly defend on the ground that Givhan's expression substantially interfered with her work or with her relationship with Leach, and the district court made no express finding as to substantial interference. The district court's finding that Givhan's complaints were neither constant nor unreasonable might be taken as a finding that there was no substantial interference with her work. As to the finding of reasonableness, the testimony was conflicting, as noted above. There is no real dispute, however, as to whether the complaints were "constant." Although Leach referred to lists of demands, he could cite only Givhan's occasional complaints about NYC workers, integration of the office staff and administration, and cafeteria personnel. In view of our disposition of the case we need not reach the issue of substantial interference.
 
 
 [14]
 The loyalty oath and other cases make clear that requirements for public employment or public office cannot infringe on First Amendment rights to freedom of religion, association, and speech. See, e. g., United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (prohibition of defense employment due to membership in the Communist Party); Whitehill v. Elkins, 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967) (overbroad loyalty oath deters advocacy and associations protected by the First Amendment); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (seditious utterances, advocacy of forceful overthrow of government, and membership in the Communist Party); Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966) (freedom of association deterred by overbroad loyalty oath); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) (same); Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) (freedom of religion infringed by requirement that public officials declare belief in the existence of God)
 
 
 [15]
 This implication also can be found in our teacher dismissal and freedom of speech cases. See, e. g., Megill v. Board of Regents, supra (context of remarks justified Board action; remarks, however, were clearly public, and included expressions in a press conference, in a newspaper interview, in a panel discussion attended by 50 people, at a public meeting on campus, and at a meeting of the Board); Kaprelian v. Texas Woman's Univ., 509 F.2d 133, 139 (5th Cir. 1975) (teacher protected in voicing and applying in his teaching academic views relevant to assignments); Lewis v. Spencer, 490 F.2d 93 (5th Cir. 1974), aff'g, 369 F.Supp. 1219 (S.D.Tex.1973) (appearance before state legislature and participation in organizing a local chapter of a teachers' association are protected); Duke v. North Texas State Univ., 469 F.2d 829, 832 (5th Cir. 1972), cert. denied, 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973) (teacher protected in her remarks to students and prospective students at a meeting in a campus park); Moore v. Winfield City Bd. of Educ., 452 F.2d 726, 727 (5th Cir. 1971) (Board action not motivated by teacher's expressions, which included criticism of school administration in speech at a local Classroom Teachers Association dinner); Pred v. Board of Pub. Instruction, 415 F.2d 851, 853-54 (5th Cir. 1969) (participation in an organization and advocacy in classroom instruction of "demands" for campus freedom protected). See also Abbott v. Thetford, supra (substantial interference of expression with job justified dismissal; expression in the form of a lawsuit); Smith v. United States, supra, at 516 (substantial interference of expression with job justified dismissal; expression made by wearing of a peace pin)
 
 
 [16]
 Rowan is arguably distinguishable because of the citizen's compelling interest in privacy within his or her own residence. E. g., Organization for a Better Austin v. Keefe, 402 U.S. 415, 420, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1, 6 (1971). The rationale of Rowan, however, is not limited to the home. It applies whenever "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." Erznoznik v. City of Jacksonville, 422 U.S. 205, 209 & n. 5, 95 S.Ct. 2268, 2272 & n. 5, 45 L.Ed.2d 124, 131 & n. 5 (1975) (Powell, J.). While an intrusion on privacy in the home may be of greater significance than an intrusion on privacy in the workplace, one's "degree of captivity" in the workplace may be much greater. In the normal course of his job, principal Leach could hardly avoid exposure to teacher Givhan and her demands, requests, and complaints. Indeed, as a practical matter Leach was a very captive audience for Givhan as long as they both worked in the same school
 
 
 [17]
 Leach testified that he sent her lists of demands to the school superintendent. Apparently they were ignored. That does not alter the fact that Givhan chose Leach as the only recipient of her expressions
 
 
 [18]
 E. g., In re Southwestern Bell Telephone Co., 542 F.2d 297, 298 (5th Cir. 1976) (en banc) (Hill, J., dissenting), rev'd, --- U.S. ----, 97 S.Ct. 1439, 52 L.Ed.2d 1 (1977)
 
 
 [19]
 If on remand appellee succeeds on her Singleton claim, it will be for the district court in the first instance to determine the propriety of reinstatement as a remedy in accordance with our discussion of reinstatement as to Hodges, infra
 
 
 [20]
 Kaprelian v. Texas Woman's Univ., supra, at 135 (Gee, J.)
 
 
 [21]
 She testified that when she wrote and signed the recommendation she had little time and was otherwise "under pressure." She explained that she had signed other documents for Leach before, at his request, but she admitted that he did not authorize her to complete and sign in his name her own recommendation. It is also well established that when she had difficulty "finding" Leach for his recommendation she knew he had recommended that she not be rehired for the next school year
 
 
 [22]
 E.g., Moore v. School Board, 364 F.Supp. 355, 361 (N.D.Fla. 1973) (reinstatement inappropriate where teacher had abused authority by relating to students his personal experiences with prostitutes and other illegitimate topics). See also Florida Steel Corp. v. NLRB, 529 F.2d 1225, 1234 (5th Cir. 1976) (employee raised fist and cursed supervisor); Trailmobile Division, Pullman Incorporated v. NLRB, 407 F.2d 1006, 1018 (5th Cir. 1969) (reinstatement denied to striking employees who intimidated and assaulted nonstriking employee); NLRB v. Big Three Welding Equipment Co., 359 F.2d 77, 83 (5th Cir. 1966) (reinstatement denied to employees who pilfered company property); NLRB v. Bin-Dicator Company, 356 F.2d 210, 215-16 (6th Cir. 1966) (reinstatement denied to employee who made "fearsome threats and gestures" to supervisors); NLRB v. R.C. Can Company, 340 F.2d 433, 435-36 (5th Cir. 1965) (reinstatement denied to employee who threatened to harm the plant manager); NLRB v. Coca-Cola Bottling Co., 333 F.2d 181, 185 (7th Cir. 1964) (employee disqualified from reemployment by "his pattern of falsification and deceit during his employment"); NLRB v. National Furniture Mfg. Co., 315 F.2d 280, 286 (7th Cir. 1963) (reinstatement denied because of "basic antagonism" between employee and employer)