[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This civil action is a claim of judicial review under provisions of G.L. 1956 (1986 Reenactment) § 28-5-28 of a decision and order of the Rhode Island Commission for Human Rights (hereinafter "the Commission") issued on June 29, 1992. In its decision and order the Commission concluded that the Department of Corrections (hereinafter "the Department") had discriminated against Joe Louis Tucker, Jr. (hereinafter "Tucker") because he had filed a previous charge of discrimination against the Department in violation of §28-5-7(5). Section 28-5-7 reads in pertinent part:
 "It shall be an unlawful employment practice:
 * * *
 "(5) For any employer *** to discriminate in any manner against any individual *** because he or she has made a charge *** in any investigation, proceeding or hearing under this chapter (State Fair Employment Practices Act)." (Emphasis supplied).
The Commission ordered extensive relief to Tucker including re-employment, restoration of seniority and benefits, re-payment of his last pay net of unemployment benefits, interest, and counsel fees. This action was commenced on July 23, 1992. A stay of the Commission's order was entered on August 31, 1992. The Commission's record was certified to this Court on November 24, 1992. Briefing was completed on March 26, 1993. This matter was assigned to this Justice for decision on April 21, 1993.
I.
The historical facts in this case are not in dispute. The parties generally agree as to what happened. They disagree vehemently as to why it happened. The Department contends it denied Tucker a permanent appointment as a correctional officer because he demonstrated during his probationary period that he was not likely to do the job well. The Commission found that he was denied appointment because he had filed a previous charge of racial discrimination against the Department.
On June 30, 1987, Tucker, a male of African-American descent, filed a charge of race discrimination against the Department, which was resolved on November 5, 1987 by a negotiated settlement. Pursuant to that settlement Tucker applied for employment as a correctional officer and was accepted for enrollment in the Department's training academy, which he completed successfully. At his graduation he was cautioned by an official of the Department: "Congratulations, Mr. Tucker. But, we will be keeping an eye on you." On March 13, 1988 Tucker began working as a probationary correctional officer in medium security at the Adult Correctional Institution.
Tucker's initial probationary reports in May 1988 were generally good. Early in May 1988 he was transferred from medium security to high security where he came under the supervision of Associate Director William Quattrocchi (hereinafter "Quattrocchi") and there his troubles began. Shortly after Tucker's transfer his former supervisor in medium security wrote a memorandum on May 16, 1988 regarding a counselling session because Tucker had filed disciplinary reports about ("booked") several inmates during his last two weeks in medium. On June 21, 1988, Quattrocchi wrote a memorandum to Tucker that he had violated "established procedures" in seeking overtime work in the Womens Division, a facility to which he was not bid or assigned. Sometime before his second probationary report on July 12, 1988 Tucker urinated in the yard while he was supervising inmates.
Tucker's second probationary reports contrasted starkly with his first. None of the reports were good and Quattrocchi found him "unsuitable to continue as an officer." Nevertheless, Tucker was retained. He did discuss his second report with Quattrocchi. During that discussion he admitted the urination episode but denied that he watched TV in an inmates's cell. Quattrocchi's source for the TV incident apparently was Captain Barbara Headen, a female of African-American descent, who did not specifically mention either incident in her probationary report on Tucker. On July 12, 1988, Quattrocchi filed a written reprimand for the urination and television incidents. The reprimand also referred to Tucker's going on sick leave soon after beginning a shift, when he had been denied personal leave for the day before he was due to go on annual military reserve leave. Quattrocchi reprimanded Tucker even though none of Tucker's immediate supervisors had requested that he do so which the Commission found to be inconsistent with the usual practice in the Department.
Tucker's third and final probationary reports were due on September 5, 1988, since his six month probationary period would expire on September 13, 1988. Captain Headen and Lieutenant Frank Cook signed their reports on September 9, 1988. Captain James J. Vierra and Quattrocchi signed theirs on September 12. All of them show a "Received" stamp in the deputy assistant director's office on September 6. None of the supervisors rated Tucker highly, but Quattrocchi concluded that he "cannot recommend (Tucker) for permanent status as a correctional officer". On September 9, 1988 Quattrocchi formally recommended that Tucker not be continued in state service. On September 13, 1988 Tucker was dismissed from the position of correctional officer effective September 14, 1988 because of unsatisfactory job performance during his probationary period.
The Commission's findings of fact disclose that it found some inconsistencies between Quattrocchi's testimony that he had discussed Tucker with Captains Headen and Vierra, who he said concurred with his final recommendation not to appoint Tucker to a permanent position, and the exhibits and testimony of Headen and Vierra regarding Tucker's final evaluations. The Commission ultimately concluded that these inconsistencies "cast doubt on (the Department's) arguments that its treatment of (Tucker) was not based on retaliation."
The Commission found that at some time during his probationary employment, Tucker momentarily locked an out-of-sight inmate in the yard while he was bringing inmates in from the yard. It further found that this conduct violated the Department's policy.
The Commission also found as a fact that Mr. Robert Blanchard, a representative of the correctional officers union, was told in August 1988 by Quattrocchi that Assistant Director Donald Ventetuolo had called him. Quattrocchi said, according to Mr. Blanchard, that Mr. Ventetuolo wanted Quattrocchi to terminate Tucker. Quattrocchi suggested that Tucker come on the day shift so that he could be closely observed. Although Mr. Ventetuolo denied using the word "fired" with respect to Tucker, he acknowledged that he might have suggested that Tucker be closely observed.
The Commission also concluded that Quattrocchi knew that Tucker had previously made a complaint against the Department for racial discrimination in employment. This conclusion was found from inference based on the following facts. In his reprimand to Tucker dated July 12, 1988, Tucker wrote: "I am also requesting an evaluation of your entire file at this time because of your probationary status." Quattrocchi testified inconsistently about his awareness of Tucker's favorable First Probationary Reports. Tucker's personnel file contained a letter from a nephew of Mr. Donald Ventetuolo pertaining to Tucker's previous complaint. Mr. Donald Ventetuolo, who was found to have communicated directly with Quattrocchi, was fully aware of Tucker's previous complaints. Although the Commission made no specific finding, the evidence is clear that Quattrocchi took the lead in establishing the record which would be proffered by the Department to justify its termination of Tucker.
Mr. Ventetuolo testified that there were no "objective" standards for determining whether a probationary officer would be terminated. The Commission also compared Tucker's record as a probationary officer with that of four other probationary officers, three white and one Hispanic, who were appointed permanent officers. The Commission concluded that, in spite of Tucker's violations of Department policies, his offenses were treated more severely than the offenses of other probationary officers "who violated direct orders relating to security or who on numerous occasions failed to keep track of prisoners."
II.
While this case was pending before the Commission the Department gave notice that Tucker had brought an appeal from his termination before the Personnel Appeal Board (hereinafter "the Board") under G.L. 1956 (1984 Reenactment) § 36-4-42. It argued that the Commission lacked jurisdiction to hear and decide Tucker's complaint because of the pending appeal before the Board which it said raised the same issues as those before the Commission. In the course of hearing transcripts of testimony presented to the Board were received in evidence by the Commission.
For the first time, on October 28, 1992, in a filing in this Court, the Department offered for the record a decision of the Board dated February 19, 1991, which denied and dismissed Tucker's appeal. A careful review of the record of proceedings before the Commission discloses that the Board's decision was never so much as offered to the Commission for its consideration, even though transcripts from Board hearings were submitted on March 12, 1992, more than one year after proceedings had closed before the Board. The most generous explanation for the Department's failure to disclose the Board's decision to the Commission is careless oversight. Only blind charity would permit the Court to forgive the Department's failure to invoke the provisions of G.L. 1956 (1988 Reenactment) § 42-35-15(e) or §28-5-31 to allow it to present additional evidence to the Commission. In this Court the Department now argues that the Commission's decision is barred by the doctrines of res judicata or collateral estoppel.
As matters now stand, this Court's review is limited to the record of proceedings before the Commission. G.L. 1956 (1986Reenactment) § 28-5-29; G.L. 1956 (1988 Reenactment) §42-35-15(g). In addition, § 28-5-30 provides that:
 "An objection that has not been urged before the commission, its member, or agent shall not be considered by the Court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." (Emphasis supplied.)
Since these proceedings are by no means a trial de novo,
these statutory raise-or-waive rules serve a salutary purpose.
Fairness to the parties as well as to the trial tribunal, itself, demands that the decision of the original hearing body not be subjected to the test of later-produced evidence in the appellate tribunal. General jurisdiction courts should not be expected to weigh new evidence in the domain of the expertise ofspecialized administrative agencies which was not examined by the expert tribunal. Judicial efficiency requires that courts hearing appeals have a right to rely on the completeness of the record transmitted to them.
Finally, it is a well-established evidentiary requirement that a party seeking the benefit of res judicata must plead and prove the judgment on which it relies. U.S. v. Bliss,172 U.S. 321, 326, 19 S.Ct. 216, 43 L.Ed. 463 (1898). There is no obligation on the Commission to search the record of the Board to see what it decided. That burden was on the Department.Blumental v. Jones, 208 U.S. 64, 28 S.Ct. 192, 52 L.Ed. 390 (1908).
For all the foregoing reasons, based on the record before the Court, the doctrines of res judicata and collateral estoppel do not bar the Commission from issuing its decision and order.
IV.
The Department contends that the Commission's decision is arbitrary and capricious and is not supported by substantial competent evidence considering the record as a whole. Its first contention is that Tucker's termination could not have been retaliatory because Quattrocchi's recommendation was based on the observations and evaluations of supervisors who were not shown by the record to be aware of Tucker's previous complaint of discrimination to the Commission against the Department. It is clear from the record that the real final decision-maker was in fact Assistant Director Ventetuolo, since the Director almost invariably approved his recommendations. It is undisputed that he knew about the earlier complaint by Tucker. He did not deny that he advised Quattrocchi to observe Tucker closely. The Commission apparently accepted as credible Mr. Blanchard's testimony that Mr. Ventetuolo had suggested to Quattrocchi that Tucker be terminated. The Commission also found that Quattrocchi had reviewed Tucker's file which contained a communication referring to his prior complaint. The Commission also found that Quattrocchi's denial of any knowledge of the previous complaint was not credible. While this evidence cannot be described as a preponderance, it is something more than a scintilla, even if not much more. Caswell v. George Sherman Sand and Gravel Co.,424 A.2d 646, 647 (R.I. 1981).
Next it argues that Tucker's misconduct was a sufficient independent ground to terminate Tucker. The Commission did conclude:
 "The respondent presented legitimate, nondiscriminatory reasons for its actions. The complainant urinated in the yard while supervising inmates. The respondent received a report that the complainant momentarily locked a prisoner in the yard while returning prisoners to their cells. The complainant's Second and Final Probationary Reports were not good.
 Once a respondent has presented legitimate, nondiscriminatory reasons for its actions, the complainant may prove retaliation by proving that respondent's given reasons are not credible or by showing that it is more likely that the respondent was motivated by retaliation."
 Decision and Order, p. 15.
The Commission's findings that the Department's proffered reasons for its treatment of Tucker were a pretext for retaliation is inconsistent with its finding that those reasons were a legitimate reason for terminating him. The Commission did not find that Tucker's violations were concocted falsehoods or were deliberately exaggerated minor incidents. Considering the record as a whole this is plainly a mixed motivation case.
The Commission was confronted by a situation similar to that before the United States Supreme Court in Price Waterhouse v.Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). An employee has produced evidence that his termination was caused by unlawful discrimination. An employer has produced evidence of legitimate factors which formed the basis for its decision to terminate the employee. In construing Title VII of the CivilRights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000eet seq., the Federal equivalent of G.L. 1956 (1988Reenactment) § 28-5-1 et seq., with regard to gender discrimination the Court said:
 "To say that an employer may not take gender into account is not, however, the end of the matter, for that describes only one aspect of Title VII. The other important aspect of the statute is its preservation of an employer's remaining freedom of choice. We conclude that the preservation of this freedom means that an employer shall not be liable if it can prove that, even if it had not taken gender into account, it would have come to the same decision regarding a particular person. The statute's maintenance of employer prerogatives is evident from the statute itself and from its history, both in Congress and in this Court."
 490 U.S., at 242, 109 S.Ct., at 1786, 104 L.Ed.2d, at 283.
A plurality of the Court held that in a mixed-motivation situation the employer must prove by a fair preponderance of the evidence that it would have terminated the employee for the legitimate reason as an affirmative defense.
 "As to the employer's proof, in most cases, the employer should be able to present some objective evidence as to its probable decision in the absence of an impermissible motive. Moreover, proving "that the same decision would have been justified . . . is not the same as proving that the same decision would have been made." Givhan, 439 U.S. at 416, 58 L.Ed.2d 619, 99 S.Ct. 693, quoting Ayers v. Western Line Consolidated School District, 555 F.2d 1309, 1315 (CA5 1977). An employer may not, in other words, prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision. Finally, an employer may not meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason. The very premise of a mixed-motives case is that a legitimate reason was present, and indeed, in this case, Price Waterhouse already has made this showing by convincing Judge Gesell that Hopkins' interpersonal problems were a legitimate concern. The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision." (Footnote omitted).
 490 U.S., at 252, 109 S.Ct. at 1791-92, 104 L.Ed. 2d, at 289.
Although the Congress amended Title VII of the CivilRights Act of 1964 by Section 107 of the Civil Rights Act of1991 (P.L. 102-166) by adding subsection (m) to section 703:
 "Except as otherwise provided in this title, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."
In the same amendment it limited relief under § 706(g) of the Act against a respondent who demonstrates that it would have taken the same action in the absence of the impermissible motivating factor to declaratory relief, injunctive relief and limited attorney's fees and costs, and prohibited an award of damages, reinstatement, hiring, promotion or payment. Our State Act has not been amended in like fashion, and so PriceWaterhouse furnishes respectable guidance in mixed-motivation cases like this one. See Newport Shipyard, Inc. v. RhodeIsland Commission for Human Rights, 484 A.2d 893, 897-98 (R.I. 1984).
In this case the Commission found that retaliation was a motivating factor in Tucker's discharge because (1) the standards for deciding to retain or terminate a probationary officer are subjective, (2) Quattrocchi was causing Tucker to be observed more closely than necessary, and (3) Tucker was receiving disparately more severe treatment than did other probationary officers whose violations were more serious than his. The Commission also found that because of inconsistencies in and between the testimony of Quattrocchi and other of the Department's officers the Department's denial of its retaliation was not credible.
In view of the great weight the Commission attached to the inconsistencies in the testimony of the Department's witnesses and to the energy Quattrocchi expended to see that every instance of minor misconduct by Tucker was memorialized in writing there is no possibility it could have found that the Department satisfied its burden of proof that it would have terminated Tucker even if he had not been in the protected class in §28-5-7(5).
This Court is mindful that the Commission will be seriously hampered in its work if employees, irrespective of their membership in a protected class, cannot complain to the Commission or give evidence before the Commission without risk to their employment. The Commission should not be castigated for being especially sensitive to threats to its accessibility. If the Department feels that such sensitivity affords special protection to employees who successfully complain against it to the Commission, relief is easily available. It can stop engaging in the discrimination which led to the employee's success before the Commission in the first place.
Accordingly, the plaintiff's appeal is denied and dismissed. The stay heretofore entered is vacated. The Commission's Decision and Order is affirmed.
The defendants will enter judgment on notice to the plaintiff.