Martha TAYLOR, Plaintiff,

v.

FRANKLIN DRAPERY COMPANY, INC., et al., Defendants.

No. 74CV331-W-4.

United States District Court, W. D. Missouri, W. D.

Dec. 1, 1977.

280

Irving Achtenberg, David Achtenberg, Achtenberg, Sandler & Balkin, Kansas City, Mo., for plaintiff.

Robert A. Sneizek, Joseph P. Teasdale, Kansas City, Mo., for defendants.

MEMORANDUM AND ORDER

I.

INTRODUCTION

A.

*Nature of the Action*

ELMO B. HUNTER, District Judge.

This is an action in two counts for relief under the Fair Labor Standards Act of 1938, as amended by, *inter alia*, the Equal Pay Act of 1963 (29 U.S.C. § 201 et seq.) and under the Civil Rights Act of 1964, as amended by, *inter alia*, the Equal Employment Opportunity Act of 1972 (42 U.S.C. § 2000e, et seq.). Under Count I, plaintiff seeks damages, liquidated damages, costs and attorneys fees as provided in the Equal Pay Act. Under Count II, plaintiff seeks a declaratory judgment and injunction against certain of defendants' employment practices, reinstatement, back pay, interest, attorneys fees and costs. Plaintiff alleges:

1. Defendants paid plaintiff a lower wage than they paid to employees of the male sex although they performed jobs requiring equal skill, effort and responsibility and performed them under similar working conditions.

2. Defendants discriminated against plaintiff with respect to her compensation, terms, conditions and privileges of employment by maintaining a wage structure that discriminates against females as a class.

3. Defendants discriminated against plaintiff with respect to her compensation, terms, conditions and privileges of employment by providing hospitalization benefits to male employees which it denied to female employees.

4. Defendants discriminated against plaintiff with respect to her compensation, terms, conditions and privileges of employment by hiring males into the more desirable positions.

5. Defendants discharged plaintiff because she had opposed practices made unlawful by the EEO Act and filed a charge under the EEO Act.

## B.

### Parties

Plaintiff, Martha L. Taylor, was employed by defendants at their Grandview, Missouri plant from March 27, 1972 to November 21, 1973. Defendant Franklin Drapery Company, Inc., is a Missouri corporation having its principal place of business in Grandview, Missouri. It conducts a drapery and upholstery business and, at all times relevant, was engaged in commerce and the production of goods for commerce. Defendant James David Franklin is the President and principal stockholder of defendant corporation.

While Count I of this action was originally commenced as a collective action under 29 U.S.C. § 216(b),[1] as no other employee of defendant corporation filed with the Court his or her consent to become a party plaintiff to this action, plaintiff Taylor withdrew her request that Count I proceed as a collective action (9–10).[2]

## C.

### Jurisdiction

This Court has jurisdiction over the subject matter of this action. 29 U.S.C. § 216(b), 28 U.S.C. § 1337, 28 U.S.C. § 1343(4), and 42 U.S.C. § 2000e–5(f)(3).

## II.

### Background

#### A.

##### In General

Plaintiff was hired by defendant on March 27, 1972 (39) and terminated on November 21, 1973 (45). Her first week on the job was spent in the workroom making draperies and removing and replacing defective trim (15–16). She was then transferred to the specialty department, where she remained until her termination (16). While in the specialty department, plaintiff sewed on trim and made swags, cascades, different kinds of valances, shutter inserts, tie-backs, Roman shades, bedspreads, and canopies (16–17). Plaintiff's starting salary was $1.75 per hour, but was raised, about a month later, to $1.80 per hour (39). Plaintiff's final paycheck reflected a wage rate of $1.90 per hour (47).

On July 26, 1973, plaintiff filed a complaint with the Equal Employment Opportunity Commission, charging that defendant

> is engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended, by discriminating against me because of my sex. I started work in March, 1972, at $1.75/hour and have only received a raise to $1.85/hour. The men there make over $4.00 per hour. There are no women in any higher paying jobs. Hospitalization is not paid for the women. They also do not hire any Negroes.

About a month later (43), Bob Crane, defendant Franklin, and Tom Sloan met with plaintiff to discuss her filing of the EEOC complaint (43; 190; 235). Defendant

---

1. 29 U.S.C. § 216(b) provides, in pertinent part, that actions brought pursuant to 29 U.S.C. §§ 206 or 207 may be brought "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."

2. Throughout this opinion, this Court will refer to the testimony at trial, giving, at the end of each such reference, the transcript page number(s) on which such testimony appears. References to testimony recorded in Volume II of the transcript will be preceded by "II," thus: (II: 496).

Franklin explains the purpose of the conference thus:

When we got the complaint, we contacted the EEOC and asked them what would be the best way to start, you know, learning something about this and what we should do. And they recommended that we could start by talking to Mrs. Taylor and see if we could resolve the grievances she had against us.

And we had her come up and come in the office with Bob Crane, Tom Sloan, and myself, and we asked her what the problem was. And she said we had sex discriminated, race discriminated, and wage discriminated. I asked her why she didn't come to me first, and I don't remember what her answer was. That is about the extent of what I remember about the meeting.

Plaintiff contends that, at the conference, it was indicated that, although defendant could not fire her for filing her complaint with the EEOC, he could fire her for performing poorly on the job. In her testimony, plaintiff stated that, at the conference, "Tom Sloan told me that they couldn't fire me but they sure could see my work wasn't any good any more" (43). Mr. Sloan denies having said this to plaintiff (II: 96).

Plaintiff was fired on November 21, 1973 (45), approximately three months after this conference. Defendant, in its service letter to plaintiff, gave the following as the reason for plaintiff's having been fired:

. . . general disruptive attitude which she had apparently fostered for some time, which made it impossible for her to get along with her fellow workers. On November 21, 1973, she engaged in an argument in which she verbally abused one of her fellow workers. After speaking to this fellow worker, it was decided

3. Plaintiff's Exhibit 31.

4. Plaintiff testified that at the November 21, 1973 conference, Bob Crane told her that she was being fired "because I had filed this EEOC complaint and I had made the girls belligerent" (45). However, Mr. Crane states that his wanting to have plaintiff terminated had nothing to do with the filing of the complaint with the EEOC (II: 7). Defendant Franklin categorical-

by her immediate supervisor, Mr. Franklin, that it was in the best interest of the company and her fellow workers that she be terminated.[3]

Approximately fifty days after she was fired, plaintiff filed another complaint with the EEOC. In this complaint, she alleged that defendant corporation had discharged her because she had filed her first complaint with the EEOC.[4] On June 6, 1974, plaintiff received a "Notice of Right to Sue Within 90 Days" in which she was notified by EEOC that conciliation efforts had failed, that EEOC had chosen not to file suit with respect to plaintiff's charges, and that plaintiff had the right to file a civil action in the federal courts. Suit was filed with this Court on June 21, 1974. The parties agree that all EEOC requirements for the bringing of this action have been fulfilled.

### B.

### An Examination of the Four Departments

Defendant corporation is divided into five departments: workroom, specialty, installation, upholstery, and office (12). Only the functions of the first four of these departments are relevant to the case before the Court.

### The Workroom

The primary function of the workroom is to make draperies (12, 61). This requires the employees to carry their own fabric and lining across the room, cut the material, press, sew, and fold the material, and bag drapes (115). The jobs performed in the workroom are primarily of the sewing and seamstress variety, and entail cutting, sewing, tabling[5] and finishing the fabric.

ly denies having fired plaintiff because she filed the EEOC complaint (203) or that her firing was in any way motivated by sex discrimination (188). This will be fully discussed in that section of this opinion which deals with the retaliatory discharge issue, infra.

5. The tabler places the fabric on the table and puts the hem in (II: 210).

Defendant has employed, on the average, fifteen or sixteen women, but only four males in the workroom since plaintiff was hired (92, 113). However, none of the males employed in the workroom sewed (83, 92); rather, Mr. Bob Mewmaw and Mr. Donnie Collins served, at different times, as manager of the workroom (92; II: 82), and the two young men employed in the workroom ran errands and did any odd jobs that needed to be performed (113). The testimony indicates that no men ever applied to do any type of sewing work in the workroom for defendant corporation (175; II: 79, 178).

*The Specialty Department*

Cornices, self-valances, swags, cascades, lambequins, trim, tie-backs, and Austrian valances are among the items made in defendant's specialty department. The women employed in the specialty department were plaintiff, Ocie Parsley, and Elean La-Passer (92, 214); four males were employed in the department.[6]

The women in the specialty department performed such tasks as sewing and making soft treatment and tie-backs (175). Men employed in the specialty department, on the other hand, have always worked on the cornices. Women, however, have never applied for jobs in the Specialty Department to do cornice work (175; 185).

Cornice work involves the following tasks. First, the employee must either go to the lumber yard to pick up the lumber (II: 173) or unload the lumber off of the delivery truck (180). Then, the employee must stack the lumber at the location in defendant's plant where it is to be stored until ready for use (173). When the board is ready for use, the employee must select the appropriate piece of lumber from where it is stored, transfer that piece to be cut, and cut the lumber to the appropriate dimensions (181; II: 173). The employee will then cut the face board out of a ⅜ inch sheet of plywood or particle board having

dimensions of four feet by eight feet (181; II: 160). The top and side boards would then be cut from other lumber. The cutting would be done usually with a power saw but sometimes with a hand saw. After the top, side, and face boards were cut into rough shape, they would be nailed together. A pattern would then be applied to the front of the cornice and, using this pattern, the employee would cut the board to its appropriate shape. Felt or foam padding would then be applied, using either spray adhesive, tacks, or staples. The padding would then be trimmed to conform to the shape of the board. The lining and the fabric would then be applied. The fabric would be secured at one point on the board, stretched across the front of the board and secured by staple at some other point on the board. Double welt or trim is then applied at the bottom of the board (II: 159–71).

Soft treatment in the specialty department involved sewing on trim and making swags, cascades, different kinds of valances, shutter inserts, tie-backs, Roman shades, bedspreads, and canopies (16–17). The skills required to do this work were described by plaintiff at trial and require the employee to follow a pattern given them and to construct the product out of the fabric provided according to the measurements specified (17–20).

*Installation*

Those employed in the installation department, as the name of the department implies, installed draperies and top treatment at the customer's home or place of business (13–14). It is the second most profitable department of defendant's business (142).

*Upholstery*

Those employed in the upholstery department spent most of their time upholstering furniture (14). The upholstery department employed six or seven men and five women (91). While it was the least profitable de-

6. Plaintiff testified that there were two men employed full time in the specialty department, and two employed part time (92).

partment in defendant's business, the highest average salary paid by defendant was to those employed in the upholstery department (143).

With this brief overview of the case, an examination of the merits of plaintiff's contentions is in order.

## III.

### THE EQUAL PAY ACT CLAIM

The Equal Pay Act of 1963 provides, in pertinent part, at 29 U.S.C. § 206(d)(1):

No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

Plaintiff brings Count I of her complaint under this provision. Paragraph 8 of Count I states:

Defendants paid Plaintiff and persons similarly situated a lower wage than they paid to employees of the male sex, although female employees performed them under similar working conditions. This difference was not the result of a seniority, merit, or piecework system, but was based solely on the factor of sex.[7]

With regard to her Equal Pay Act claim, plaintiff first contends that the work she performed in the specialty department (sewing on trim and making swags, cascades, different kinds of valances, shutter inserts, tie-backs, Roman shades, bedspreads, and canopies (16–17, 175)) was "equal," within the meaning of the Equal Pay Act, to the work performed by the men

in the specialty department (making cornice boards (30–31)) (105–06). Plaintiff also contends that her work in the specialty department was "equal," within the meaning of the Equal Pay Act, to the work performed by the men employed in the upholstery and installation (82, 172) and upholstery departments (172). Before exploring these contentions, however, a closer examination of the applicable law is in order.

### A.

### *The Equal Pay Act*

■ "The Equal Pay Act identifies four considerations to be explored in determining whether otherwise similar jobs require equal work: skill, effort, responsibility and working conditions." *Usery v. Richman*, 558 F.2d 1318, at 1320 (8th Cir. 1977). "For work to be 'equal,' it is not necessary that the jobs be identical, but only that they be substantially equal." *Usery v. Richman*, *supra*, at 1320. It is not sufficient, however, that two jobs are somewhat comparable, for "comparability is not enough. The test to be applied is that of substantial equality." *Christopher v. State of Iowa*, 559 F.2d 1135, at 1138 (8th Cir. 1977).

■ Under the Act, the burden is on plaintiff to prove by a preponderance of the evidence that she was paid different wages than those employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1, 10, (1974); *Ridgway v. United Hospitals-Miller Division*, 563 F.2d 923, at 926–27 (8th Cir. 1977). Once the plaintiff "has sustained the burden of showing the jobs are equal, the employer can escape liability by showing the differential is justified under one of the Act's four exceptions. On this the employer has the burden. *Corning Glass Works v. Brennan*, *supra*, 417 U.S. at 196–97, 94 S.Ct.

---

**7.** At trial, plaintiff indicated that she did not desire for this action to proceed on behalf of

others and withdrew the collective aspect of this action from the case.

2223." *Usery v. Richman, supra,* at 1320. See also *Ridgway v. United Hospitals-Miller Division, supra,* at 926–27; *Christopher v. State of Iowa, supra,* at 1138.

■ It should also be noted that "the consideration of equal pay standards is based on actual job requirements and performance, and not on job classification or titles." *Christopher v. State of Iowa, supra,* at 1136.

With these general considerations in mind, plaintiff's claim under the Equal Pay Act will now be examined.

## B.

*Did the job which plaintiff performed in the specialty department require skill, effort, and responsibility equal to that required by the jobs performed by men in the installation department?*

Employees of defendant who worked in the installation department must go to customers' homes to install draperies, dress them down, and take care of customer complaints (167). The installer's job is a very physically exhausting one (II: 109; 112; 190), involving lifting, hauling (167–168), and spending hours drilling and screwing into walls (II: 109). The installer must lift not just rods and drapes, but cornice boards as well (II: 143), adding to the physical nature of the job.

The job also involves driving a ¾ ton truck or a ½ ton van (253) (thus making it absolutely essential that the installer know how to drive (II: 221)[8] and working after dark (167–8; II: 109).

Because the customer is often watching them as they work, installers need to know how to perform their duties under pressure and know how to deal effectively with people (207). Because they are under public scrutiny and because they are the last people representing defendant that the customer sees, installers have a great deal of responsibility (208; II: 108, 145).

As Mr. John Cochran, owner and manager of a company which competes with defendants, testified:

The installer has much more responsibility. He has to be a public relations man while he is on the job. You can imagine what it is like going into a lady's house and she is standing there watching you install her draperies which she has waited for months for. He has to be a public relations man, a mechanic, diplomat, and skilled in what he is doing. (II: 108).

As Mr. Frank Mountjoy, another competitor of defendants, stated:

An installer has to go out and figure each job individually. He may have six pair of drapes that you will hang differently in each house. You can't just go in and put them up. You have to use your head to determine how they are going to come out properly. So there is a little more mental in the basis we are talking about, production line basis, there is more skill involved in installing than there would be in any one particular job. (II: 203–04).

And, as Mr. David C. Jones, another of defendant's competitors, testified:

[The installer] is the last personal contact with the customer. My ability in this business has always been sales, and the installer has to be the salesman, he has to handle money, he has to be responsible, he has to have strength enough to load and unload, he has to be able to install the draperies, to dress them in on the job, and I feel that it should be a man. . .

[The installer] picks up C.O.D.'s, picks up checks, handles cash. He has to be very trustworthy. There is a lot of responsibility for an installer. I would say there is probably more responsibility on an installer than almost any job other than management. (II: 215).

There is also a good deal of skill and mental efforts involved in the installer's job. To begin with, he must be able to read and comprehend the work ticket, put to-

---

**8.** Plaintiff cannot drive (83) and admits that, because of this, she could not have performed installation work (83). While this will affect her failure to promote claim which she brings under Title VII, discussed *infra*, it does not bar her Equal Pay Claim.

gether the rods and drapes, and position them properly on the wall (II: 107). And, as stated by Mr. Cochran, "[a]n installer has to go out and figure each job individually. He may have six pair of drapes that you will hang differently in each house. You can't just go in and put them up. You have to use your head to determine how they are going to come out properly" (II: 113).

A review of the expert testimony reveals that work performed by the men in the installation department not only required more skill (185; II: 106–07), effort (184–85; II: 112–13), and responsibility (203; II: 103) than the work performed by plaintiff, but was performed under substantially different working conditions (II: 118).[9] The Court must, therefore, reject plaintiff's contention that the work performed by plaintiff and the work performed by men in the installation department were "equal" within the meaning of the Equal Pay Act. In rejecting this claim, the Court feels the following portion of 29 C.F.R. § 800.120 [10] to be particularly appropriate:

> [I]t is clear that Congress did not intend to apply the equal pay standard to jobs substantially differing in their terms and conditions. Thus, the question of whether a female bookkeeper should be paid as much as a male file clerk required to perform a substantially different job is outside the purview of the equal pay provisions. It is also clear that the equal [sic] pay standard is not to be applied where only men are employed in the establishment in one job and only women are employed in a dissimilar job. For example, the standard would not apply where only women are employed in clerk typist positions and only men are employed in jobs as administrative secre-

taries if the latter really require substantially different duties.

## C.

*Did the job which plaintiff performed in the specialty department require skill, effort, and responsibility equal to that required by jobs performed by men in the upholstery department?*

Plaintiff contends that she should have been paid the same wages as men who worked for defendant in the upholstery department (81–82). These men were required, by their jobs, to strip furniture down, glue it back together, and re-tie springs (209). In addition, they would, on occasion, have to deal with the public by responding to customer complaints and making estimates (209–10). Because of this, according to the expert testimony, the men doing the upholstery work shouldered greater responsibility than did plaintiff (209). Further, there was testimony that upholstery work which the men performed for defendant required greater skill and talent than the work required by plaintiff at her job (210).[11] Certainly, it required more skill, training, and physical effort than did the jobs performed by the women in the workroom (II: 146–47).

The work performed by men in the upholstery department not only requires greater skill, talent, and responsibility than does the work performed by plaintiff, it is more strenuous physically (II: 58–59, 71–72, 220). As stated by Michael Cincotta, a witness who had sixteen years of upholstery experience at the time of trial:

> [Upholstery work requires that] you use a lot of strength in your hands. . . . You are pulling. You are always stretching, especially with your left arm if you

---

**9.** As Mr. John W. Cochran testified:

[The installer] takes the house as it is. Sometimes it is a new residence, sometimes a commercial building, sometimes it is a hospital. We have worked in the Jackson County Home. You think there is a place that is difficult to work, send someone out to try and work around patients' beds. It is a very difficult thing to be an installer at times . . . (II: 118).

**10.** Promulgated by the Secretary of Labor.

**11.** Upholsters have special training for their work (82, 210; II: 5, 65), something which plaintiff admits she lacks (82). However, plaintiff does claim that she can do upholstery work as well as any man in the upholstery department (101).

are right-handed; be the other way if you are left-handed, see. But, like, take for example these vinyl chairs. It is very, very difficult—especially if you get a piece of vinyl that is a little stiff or not soft—to stretch it where you don't have any wrinkles in it.

It takes—some days you will walk out of the shop and will be beat to death, because it is hard for a man to do that. . . . [I]t is hard for anybody because it is very difficult on the fingers and the strength it takes in the hands. (II: 58–59) [12]

As a result of the greater skill, talent, responsibility, and effort required by the job, a competent upholsterer was described as very rare and very hard to find (210), certainly harder to find than someone who could perform plaintiff's job (210). The testimony indicates that "there has always been and there presently is" a shortage of qualified upholsterers in the Kansas City area (II: 65).

█ These differences in the skill, responsibility, and effort required of the employee by the two jobs persuades the Court to reject plaintiff's contention that the work performed by plaintiff and the work performed by men in the upholstery department were "equal" within the meaning of the Equal Pay Act. Plaintiff's job was simply quite different than the job required of upholsterers employed by defendant corporation. As such, plaintiff's claim under the Equal Pay Act must fail. *See* 29 C.F.R. § 800.120, quoted in part, *supra*.

### D.

*Did the job which plaintiff performed in the specialty department require skill, effort, and responsibility equal to that required by the job performed by men in the specialty department?*

Plaintiff contends that, because the work she performed in the specialty department required skill, effort, and responsibility equal to the work performed by the men in the specialty department, because their respective jobs were performed under similar working conditions, and because the wage scale for her job was lower than that for the men's job, the Equal Pay Act was violated by defendant.

As indicated earlier, plaintiff's job in the specialty department required her to do "soft" top treatment (sewing on trim and making swags, cascades, different kinds of valances, shutter inserts, tie-backs, etc.), while the work performed by the men in defendant's specialty department required them to do "hard" top treatment (making cornice boards) (16–17; 30–31; 105–106). Plaintiff's job in the specialty department basically required sewing and seamstress work, and nothing heavier than that (79).

Cornice work, on the other hand, is physically strenuous. As was explained earlier in this Opinion, cornice work involves the following tasks: First, the employee must either go to the lumber yard to pick up the lumber (II: 124, 173) or unload the lumber off of the delivery truck (180).[13] Then the employee must stack the lumber at the location in defendant's plant where it is to be stored until ready for use (173). When the board is ready for use, the employee must select the appropriate piece of lumber from where it is stored, transfer that piece to be cut, and cut the lumber to the appropriate dimensions (181; II: 173). The employee will then cut the face board out of a ⅜ inch sheet of plywood or particle board having dimensions of four feet by eight feet (181; II: 160). The top and side boards would then be cut from other lumber. The cutting would be done usually with a power saw, but sometimes with a handsaw. The boards would then be nailed together. Further detailing of the cornice worker's job is

---

12. At the time of trial, Mr. Cincotti was 32 years old, 5'4" tall, and weighed 230 pounds. When he worked as an upholsterer for defendant, he weighed "anywhere from about 230 to 270 pounds" (II: 59).

13. Plaintiff testified that the delivery men unloaded the trucks and brought the lumber into defendant's place of business (100). Defendant Franklin, however, testified that "the truck drivers will help you unload, but they won't unload by themselves."

given in Part II(B) of this Opinion, *supra*, and will not be repeated here.

The boards handled by the men in the specialty department are described by plaintiff as being "very heavy" (78).[14] In fact, at times the cornice boards are "so large that they had to put hinges on them and fold them in order to get them in an elevator up in an apartment building" (69–70). Plaintiff testified that the work she and other women performed in the specialty department involved sewing and seamstress work, and nothing heavier than that (79). Further, she concedes that the work performed by the men in the specialty department required more physical effort than the work which she performed (78).[15] The evidence indicated not only that cornice workers would have to lift heavy boards, but that they would have to do this repeatedly throughout the day (II: 3). The continual lifting of heavy weights is not, however, the sole "physical" aspect of the cornice workers job; rather, the bulk of the boards and the maneuvering of them which the job requires, when combined with the weight of the boards, constitute the real physical burden on the cornice worker. Not only does it take physical strength to maneuver the bulky lumber (II: 194),[16] it requires skill to put the boards through a saw (II: 195)[17] without binding the saw. As one witness succinctly put it: "To do [cornice work] every day would be quite a chore" (II: 66).

The evidence overwhelmingly convinces the Court that those employed by defendant to manufacture cornice boards possessed greater skill[18] and responsibility[19] and had to expend more effort[20] to perform their jobs than did plaintiff to perform hers.

Having been convinced by the evidence that there are distinct differences between the skill, responsibility, and effort required of the employee doing cornice work and the employee doing soft top treatment, the

---

14. The particle boards used most often for making cornices measured 4′ × 8′ and were ⅜ or ½ inch thick and weighed approximately 48 pounds each (70, 181). The majority of cornice boards, once completed, are approximately 24 inches deep (II: 172) and some are as long as 170 inches (II: 171) and weigh up to 120 pounds (181).

15. Plaintiff does contend, however, that there was no task which the men in the specialty department could perform which she could not perform (99) and she further contends that there were tasks that her job required of her which the men in the specialty department could not perform (100–01).

16. One witness described the cornice worker's job as "awkward," "heavy," and "awfully bulky work" (II: 28). Another stated: "It is very common to have an 18-foot wall-to-wall cornice board that is twenty inches deep out of particle board that weighs 120 to 125 pounds. It has to be flipped over and turned many times during the process of upholstery" (II: 219–20).

17. One witness stated: "The physical endeavor of making cornices, if it is carried out to the complete facet, it is a very heavy thing. It takes brawn to handle sheets of plywood. I think anybody that has ever picked up a sheet of plyboard or a piece of particle board, which is commonly used in the trade today, would know that a 4 × 8 piece of panel is hard to handle and put through a saw." (II: 194–95).

18. Cornice workers had to possess more skill to perform their jobs than did plaintiff to perform hers (185; II: 11–12, 206–07, 219, 222), not only because cornice work requires heavy lifting and the use of power tools (II: 11–12), but also because, as one witness explained: "[Y]ou are given a particular design to make for a customer. You have to lay the work out. You have to figure out—you have to really know what you are doing. . . . [Y]ou have got to read plans—you have several different materials to work with at the same time. You have designs to cut out. If there is any particular error in the designer's work sheet, you have to call him or have him called, and you have to correct it yourself, possibly." (II: 207–08).

19. The cornice worker's job held greater responsibility than did plaintiff's position (II: 196, 208, 223). As one witness explained: "[Y]ou have plans to work with. You have to come out with particular measurements. You have to make the design. You have to have several different materials to work with. If you have two fabrics that go on one cornice board, you have to know which one to apply first and which one second" (II: 209).

20. The testimony clearly indicated that the cornice worker's job required the employee to expend more effort than did plaintiff's job (185; II: 115, 208, 222).

Court must reject plaintiff's contention that the work she performed in defendant's specialty department is "equal," within the meaning of the Equal Pay Act, to the work performed by the men in the specialty department. As earlier discussed, cornice work is substantially different from the work required of plaintiff by her job. Therefore, plaintiff's equal pay for equal work claim must fail, for the work is simply not "equal." *See* Department of Labor, Wage and Hour Division regulation, 29 C.F.R. § 800.120, quoted in part, *supra*.

## IV.

## THE EQUAL EMPLOYMENT OPPORTUNITY ACT CLAIM

### A.

### *Medical Insurance*

42 U.S.C. § 2000e–2(a)(1) provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . .

The Equal Employment Opportunity Commission has, by regulation,[21] provided:

It shall be an unlawful employment practice for an employer to discriminate between men and women with regard to fringe benefits.[22]

Plaintiff claims that defendants transgressed the statute by failing to provide her, and other of defendant corporation's female employees, free hospitalization benefits, while providing such free benefits for its male employees.

The evidence indicates that defendant corporation paid the premiums for its male employees' Blue Cross and Blue Shield insurance (however, were the male employee to desire coverage for his dependents, he would have to pay, from his own funds, that portion of the premium attributable to coverage for his dependents), but not for its female employees (39–41). As defendant Franklin admitted at trial:

Q. Isn't it a fact that your policy was not pay the women's, any part of the women's hospitalization, but to pay the employee portion of the men's hospitalization?

A. Yes. (150)

Defendant Franklin did testify, however, that the company paid the employee portion of Ocie Parsley's insurance, pointing out that Ms. Parsley was a key employee and plaintiff was not (205). He thus contended that the determination of whether or not to pay the employee's portion of the medical insurance premium was based upon a judgment call as to the individual employee's value to the company, and not upon discrimination against females as a class (204–05). Defendant best explained his position and the position of the company when he stated:

Prior to taking out hospitalization, we ran a small survey to see who could use insurance and who couldn't. And in most instances, I would say 80 percent of the cases with female employees their husband had hospitalization, and I took it upon myself to inactively take out the insurance and I would provide it for some of the men, and that I would, instead of offering it to the women, I would let them make the decision to take the insurance or take a raise. And I don't recall how we actually handled that situation. (204)

Defendant admits that he never asked plaintiff if she wanted the company to pay the employee portion of her health insurance (255); nor did he offer plaintiff a raise in lieu of paying the employee portion of her insurance (255). As a result, to obtain Blue Cross and Blue Shield coverage under the group insurance plan, plaintiff had to issue personal checks to defendant corpora-

---

**21.** 29 C.F.R. § 1604.9(b).

**22.** "Fringe benefits" includes medical, hospital, accident, life insurance and retirement benefits. 29 C.F.R. § 1604.9(a).

tion on a monthly basis (40).[23] Plaintiff testified that, at her conference with defendant, Bob Crane, and Tom Sloan after the filing of her complaint with the EEOC, she complained about defendant corporation's medical insurance policy and was told by defendant that the corporation would begin paying the employee portion of plaintiff's medical insurance premiums (44). However, as plaintiff testified (44) and as plaintiff's exhibit 26 indicates, defendant corporation never paid the employee portion of plaintiff's insurance premiums.

The applicable law is succinctly summarized in Larson, Employment Discrimination: Sex § 35.00, p. 8–2 (1975), where it is stated:

> Arguments for differences in fringe benefits based upon stereo-typed presumptions about the relative financial responsibilities of the sexes and their degree of career-orientation have been uniformly rejected by the courts and by the EEOC.

■ Based upon all the evidence, it is the Court's finding that defendant corporation, in determining whether to pay the employee portion of a given employee's medical insurance premium, did in fact discriminate on the basis of sex. That Mrs. Parsley's insurance was paid by defendant appears to be but a minor exception to the discriminatory pattern which defendant generally practiced as to employee insurance. Indeed, defendant Franklin's testimony indicates that, because eighty percent (80%) of his female employees were covered by their husbands' medical insurance policy, he made the decision not to offer insurance coverage generally to his female employee population (204). This, in the opinion of the Court, is precisely the type of decision-making, based as it is on stereo-typed generalities, which federal law is meant to prohibit.

## B.

### Discriminatory Wage Structure

■ Plaintiff contends, as articulated in her Proposed Standard Pretrial Order No. 2:

> Defendants discriminated against plaintiff with respect to her compensation, terms, conditions and privileges of employment by maintaining a wage structure that discriminates against females as a class.

This contention must be denied for much the same reason that plaintiff's Equal Pay Act claims were rejected. After carefully reviewing the evidence, this Court is convinced and finds that the wage structure was based upon defendants' evaluation of the worth of the job, and that differences in wages were the result of differences in the skill, responsibility, effort and working conditions of the various jobs. That some of the jobs which required skills, responsibilities, and effort different from what plaintiff's job required were not made available to women is perhaps best considered in the following section of this Opinion.

## C.

### Discriminatory Hiring and Promotion Policies

■ Plaintiff next contends, as articulated in her Proposed Standard Pretrial Order No. 2:

> Defendants discriminated against plaintiff with respect to her compensation, terms, conditions and privileges of employment by hiring males into the more desirable positions.

Defendants deny that they violated federal law by hiring men to perform the higher paying jobs, pointing out that men never applied to do sewing and seamstress work (175) or to work in the workroom (219), nor did women ever apply to do upholstery (217), installation (217), or cornice work (175, 182). But this defense is seriously weakened by the fact that job openings were not posted at the plant (134) and defendants frequently advertised for "male help" or "female help," depending on the job (155; plaintiff's exhibit 16). Further,

---

**23.** *See also* Plaintiff's Exhibit 9 (defendant corporation's Blue Cross and Blue Shield records) and Plaintiff's Exhibit 26 (Plaintiff's cancelled checks to defendant corporation to pay for her Blue Cross and Blue Shield coverage).

on several occasions plaintiff asked Bob Crane, her immediate superior, for a raise (II: 21),[24] and indicated to him that she was ready, willing, and able to do cornice work in the specialty department (30; II: 22).

Nonetheless, plaintiff cannot prevail on this claim. While there were job openings in the upholstery and installation departments while plaintiff was employed by defendant, and while plaintiff was not offered an opportunity to apply for these jobs, plaintiff does not contend that she should have been promoted to either of those departments (105, 171–72), thus severing any causal connection between plaintiff's aggrievement and defendants' allegedly discriminatory hiring practices with regard to upholsterers and installers.[25] The following colloquy is helpful in understanding plaintiff's position in this regard:

THE COURT: . . . My understanding at this point is that the plaintiff is basing her case basically on that part of the Equal Pay Act that requires equal pay for equal work, and is not making the contention that she should have been transferred to upholstering or installation or some department other than where she actually was working.

In other words, if I understand the way the case is now narrowing down, it is simply that she was not getting equal pay for equal work; that is, her pay for her work was not that of the men who did equal work.

MR. DAVID ACHTENBERG: Your Honor, Mrs. Taylor's complaint narrows down to equal pay for equal work and, also, to a much smaller extent, a failure to promote to positions either in her de-partment or within the workroom that were held by men, including the witness who was just on the stand, who was paid more.

However, it is a primarily equal pay for equal work argument.

THE COURT: But is it also the failure to promote to some position in the workroom that she could have handled which had a higher pay; is that it?

MR. ACHTENBERG: That is the secondary position in this case, but I believe it is still an issue. And, of course, the question of retaliatory discharge is still an issue.

THE COURT: I understand. But you make no claim she should have been employed in the *upholstery or installation department*?

MR. ACHTENBERG: That is correct, Your Honor. *There is no claim she should have been promoted to either of those departments.* However, I am not sure that the Court—I am not sure she should not have been paid equal pay for the work that was done, as was done by the men in the department. I believe some of the work required no more skill, effort, and responsibility than the work she did in that specialty department. (171–72) [Emphasis added.]

The employees hired after plaintiff who performed jobs which plaintiff arguably might have performed were Rick Crane and Mike Johnson in the specialty department and Bruce Hensley and Roger Steen in the workroom. Plaintiff described the work performed by these young men as essentially "errand boy" work.

**24.** Defendants make much of the fact that plaintiff never asked defendant Franklin personally for a salary increase or a promotion until their conference after plaintiff filed her first EEOC complaint (*see* 67–68). The Court is persuaded, however, that plaintiff should not be prejudiced by this. If plaintiff erred in taking these matters up with Mr. Crane instead of with defendant Franklin, it was a mistake which plaintiff shared with many of her fellow employees, for Mr. Crane indicated in his testimony that it was very common for employees to ask him for raises (II: 22).

**25.** While plaintiff's testimony that she could not and would not do installation work (74, 83) and that she did not care to do upholstery work (74) does not bar her claims under the Equal Pay Act, it does prevent plaintiff from obtaining a recovery based upon any Title VII violations which may have occurred as the result of defendants' hiring policies in the upholstery or installation departments. Assuming defendants to have violated Title VII by the manner in which they hired upholsterers and installers, there is simply no causation between those violations and any harm which plaintiff may have suffered.

The Court, quite frankly, is not certain what plaintiff's precise claim is with regard to these part-time employees who served as "errand boys." Plaintiff certainly has no claim under the Equal Pay Act, for there has been no attempt to show that plaintiff's job and the jobs performed by these "errand boys" required the same skill, effort, and responsibility and were performed under similar working conditions. On the contrary, plaintiff indicates that there were substantial differences in the degree of skill, effort, and responsibility required (39, 107–08). Again, reference is made to 29 C.F.R. § 800.120, where it is stated:

[I]t is clear that Congress did not intend to apply the equal pay standard to jobs substantially differing in their terms and conditions. Thus, the question of whether a female bookkeeper should be paid as much as a male file clerk required to perform a substantially different job is outside the purview of the equal pay provisions.

There having been made no showing that the jobs which plaintiff asks the Court to compare are in any way "equal" within the meaning of the Equal Pay Act, plaintiff, if she is arguing that she should have been paid wages equal to those paid certain "errand boys" by defendant corporation, cannot prevail on that argument.

Further, with regard to these "errand boy" positions, it is unclear whether plaintiff contends that she should have been "promoted" or "transferred" to those positions. While plaintiff's complaint alleges that plaintiff "was denied the opportunity to hold more desirable jobs with the Company," it is unclear whether she considers these "errand boy" positions to constitute "more desirable jobs." However, assuming that she is contending that she should have been promoted to these positions, our examination of the evidence shows that she has failed to prove her claim.

Rick Crane was hired on September 20, 1972 at a rate of $2.00 per hour (plaintiff's exhibit 24). Rick worked in the specialty department, generally serving as an errand boy, doing odd jobs as the need arose (107–08). However, because Rick worked only part time (plaintiff's exhibit 24), the Court is convinced that plaintiff is in no way aggrieved by defendants' failing to consider her for the position. The record is devoid of any evidence that plaintiff would have given consideration to accepting a part-time position with defendant. For these reasons, the Court must reject any argument plaintiff might have that defendants violated Title VII by failing to consider her for Rick Crane's part-time position.[26]

Mike Johnson, a high school student, worked for defendant corporation from April 12, 1972 to August 24, 1972. His hourly wage was initially $1.75, but was raised to $2.00 on May 18 (plaintiff's exhibit 24). Mike was, like Rick, considered to be an errand boy, doing odd jobs as the need arose (107–08). Although the testimony does not indicate one way or the other, an examination of the hours which Mike worked indicates that his employment with defendant was essentially an after-school and summertime job (defendants' payroll records for 1972, plaintiff's exhibit 11). At the end of August, 1972, Mike quit to go back to school (plaintiff's exhibit 11). Again, the record is devoid of any evidence that plaintiff would have given any consideration to accepting a part-time position with defendant. For these reasons, therefore, the Court must reject any argument plaintiff might have that defendants violated Title VII by failing to consider her for Mike Johnson's part-time position.

Bruce Hensley, hired by defendant corporation on May 22, 1973 at $3.00 per hour, was employed temporarily to help move some steel conveyors at defendant corporation's plant (146). As Mr. Hensley was

26. The Court is aware that plaintiff may not need to prove that she *would have accepted* a part-time job were it offered to her (though this certainly would affect her damages). However, because there is nothing in the record to indicate that plaintiff would even have *con-* sidered accepting a part-time position with defendant, plaintiff has failed to meet her burden of proving any causation between her not being given a chance to apply for the job which ultimately went to Rick Crane and any loss she has suffered.

being drafted into the armed forces, defendant Franklin was under the impression that he would be employed for only two or three weeks (146). However, as he was not called as soon as he had anticipated, he remained in defendant corporation's employ until September 20, 1973 (146; defendant's payroll records for 1973, plaintiff's exhibit 12). He worked, on the average, between 25 and 26 hours per week (plaintiff's exhibit 12). Because there is no evidence that plaintiff would have given any consideration to accepting a temporary and part-time position with defendant corporation, the Court must reject any argument plaintiff might have that defendants violated Title VII by failing to provide her an opportunity to apply for the position which ultimately went to Mr. Hensley.

Roger Steen, employed by defendant corporation from October 23, 1973 to November 22, 1973, received hourly wages of $1.87 (159; plaintiff's exhibit 12). He was employed in the workroom to run errands and to help Mr. Mewmaw, the supervisor of the workroom, cut drapery linings (159, 245). He was, at the time of his employment with defendant, 16 years of age (159). While employed with defendant, he worked, on the average, 29.2 hours per week (plaintiff's exhibit 12). Nowhere in the evidence is there any suggestion that plaintiff would have considered taking this apparently part-time job. Although plaintiff was obviously aware of the circumstances surrounding Mr. Steen's employment with defendant (plaintiff called Mr. Steen as a witness), nowhere in her testimony did she refer either to him or his job. Thus, at this point, the Court is not even aware that plaintiff is contending that she should have had an opportunity to apply for the job which ultimately went to Mr. Steen. Even assuming that she is making such a contention, because Mr. Steen's position was apparently part-time, and because there is no evidence that plaintiff would have given any consid-

eration to accepting a part-time job generally and the job which Mr. Steen filled specifically, the Court finds there is no merit to any argument that plaintiff might have that defendants violated Title VII by failing to provide her an opportunity to apply for the position which ultimately went to Mr. Steen.

The Court notes that plaintiff appears to make some claim that it was somehow unfair to have Mr. Bob Mewmaw appointed as workroom supervisor in 1972. In her post-trial brief, plaintiff states:

> No females were ever made supervisors—even of the female departments. In 1972, Bob Mewmaw, was transferred from the Installation Department to become the Workroom supervisor despite the fact that there were available women with years of experience in the Workroom.

Plaintiff, however, had had only one week's experience in the workroom. Further, nowhere in her testimony does plaintiff indicate any desire whatsoever to have been considered for the position of Workroom Supervisor. The Court, therefore, does not perceive plaintiff's argument with regard to Mr. Mewmaw's being hired as Workroom Supervisor as having elevated to the posture of a failure to promote claim which plaintiff has standing to assert; rather, the Court interprets plaintiff's reference to the Mewmaw situation as merely her effort to show instances of defendant corporation's discriminatory attitude and practices. Clearly, plaintiff has not been personally aggrieved by Mr. Mewmaw's appointment as Workroom Supervisor.

 In short, while there is evidence from which the Court could conclude that defendant corporation engaged in discriminatory hiring and promotion practices,[27] plaintiff has made no effort to draw any causal connection between these allegedly discriminatory practices and any particular

---

27. Defendant corporation may have raised substantial barriers to the employment prospects of its female workers by its occasional placement of advertisements seeking male or female help depending on the job (155; plaintiff's ex-

hibit 16), failing to post job openings, and following the industry's traditions and practices as to which work men did and which work women did.

position to which *she* might have been promoted had it not been for such discrimination. As causation is an essential element of any plaintiff's case, and as this plaintiff has failed to prove causation by a preponderance of the evidence on the failure to promote issue, that issue must necessarily be, and is, resolved against plaintiff.

### D.

### Retaliatory Discharge

Plaintiff next contends that defendant corporation engaged in unlawful employment practices in violation of the Equal Employment Opportunity Act by discharging plaintiff "because she had opposed practices made unlawful by the EEOA and filed a charge under the EEOA." [28] Defendants claim that plaintiff was discharged because of her "general disruptive attitude . . which made it impossible for her to get along with her fellow workers" and because she had "engaged in an argument in which she verbally abused one of her fellow workers." [29] Defendants do not contend that plaintiff was fired because her work product itself was deficient.[30] With these contentions in mind, the evidence will now be examined.

After plaintiff filed her first complaint with the EEOC, a conference was held at which she, defendant Franklin, Bob Crane, and Tom Sloan were present (42–43). Plaintiff states that, at this conference, "Tom Sloan told me that they couldn't fire me but they sure could see my work wasn't any good any more" (43). Mr. Sloan denies having made this statement (II: 96).

Plaintiff further states that when Bob Crane told her she was being terminated, "he said it was because I had filed this EEOC complaint and I had made the girls belligerent" (45). Ethel Toliver, who worked for defendant corporation at the same time plaintiff did and who continued to work for defendant at the time of trial, testified that, after plaintiff had filed her first EEOC complaint but before she was fired, defendant Franklin told her (Ms. Toliver): "I can't fire her [plaintiff], but if I can find a reason, I will" (112).

Defendant Franklin, however, testified that he did not fire plaintiff because she filed a complaint with the EEOC (203); rather, she was fired because she could not get along with certain of defendant's employees which defendant thought were more valuable to the company than was plaintiff (203). Mr. Bob Crane, who presently contracts out certain work to plaintiff, testified that plaintiff could not get along with people, including himself, while she was employed by defendant corporation, and that he finally told defendant Franklin that "[e]ither she was going to have to go or I was going" (II: 8). As defendant Franklin put it: "[T]he day of her termination he [Bob Crane] came to me and said that one of them would have to go, he could not take any more of her" (187). Defendant Franklin further testified that he viewed Bob Crane as more valuable to the company than plaintiff (187).

There was much testimony as to plaintiff's disruptive conduct while employed by defendant corporation. Ms. Ocie Parsley testified:

THE WITNESS: That morning her table was back at this end and mine was up at this end, and she came over like this and she said I was going to shut my mouth and listen to her. I don't know whether she was going to hit me—I backed up, and she hit the table like this (indicating). I said you don't tell me—that is the first time I ever said anything back to her—I said you don't tell me to shut my mouth, and I didn't listen so I don't know what she was going to say to me.

**28.** Complaint, ¶ 22(d) (June 21, 1974).

**29.** Quotation from defendant's service letter to plaintiff (Plaintiff's Exhibit 31).

**30.** Defendant Franklin described plaintiff as "a fair employee" (189). Bob Crane stated that while she did have trouble getting along with people, she was a good worker (II: 8).

THE COURT: Is that the whole incident?

THE WITNESS: It really upset me. I put out four swag boards a day, and I was upset to where I couldn't do my work. So I walked over to Mr. Crane—he was my boss—and I told him, and he took me upstairs and talked to David.

THE COURT: Did you accompany him?

THE WITNESS: Yes. Mr. Crane went with me.

Q. (By Mr. Teasdale) What reason did you give for your wanting to leave?

A. I just told them I couldn't do my work. I should have had that board done earlier that day, and I was upset and I couldn't.

Q. Did you give the reason why you were upset?

A. Yes.

Q. What was that?

A. Well, I said I just couldn't take being jumped on. Life was too short to work under those conditions.

Q. Jumped on by whom?

A. Martha.

Q. Had she jumped on you in that manner before that day?

A. Not like that, but she had said things. She said pretty much—if she had something on her mind, she would say it.

Q. This is what I think the Judge would like to hear. Did she ever say anything to you on the job? Did she use words or adjectives that were insulting or made you unpleasant or unhappy that you can specifically remember?

A. Well, not exactly specifically. Like I said, there was—I can't remember just things, but like talking and talking about my work, stuff like that, because I enjoyed my work.

Q. Did she describe the kind of work you were doing or did she comment on your work?

A. No, not too much.

THE COURT: What did she say to you that you resented?

THE WITNESS: Well, the main thing was just like working with someone that they were going to tell you this or that, or the conditions you work under, or what.

THE COURT: That wouldn't bother me. I am trying—can you repeat the exact words or the subject of the words?

THE WITNESS: Like I say, I don't know. I didn't let her finish what she started to say. She just told me I was going to listen to her. I don't know what she was going to tell me. I told her I wouldn't listen.

Q. (By Mr. Teasdale) How many times did she try to interrupt your work with her talk?

A. She talked a lot, but I went ahead with my work.

Q. Would that happen every day?

A. She talked a lot every day.

Q. At you?

A. No, not at me. There were several in the basement in the specialty department.

Q. Did she talk loud or in a normal voice, or how?

A. She talked fairly loud. People have trouble hearing me talk. They say I talk too low.

Q. Did that bother you that she talked loud?

A. Well, I guess maybe it did to some extent. I don't know. I never even thought about it that much.

Q. Here is what the Judge wants to know, Mrs. Parsley: Is the reason you gave notice that you were going to quit is because Martha Taylor bothered you? Is that true or not?

A. That day, after she did this, like I said, when she came over with her fist, I didn't know whether she was going to hit me or what. She hit the table and said I was going to listen at her, because I backed up when she came over. I was doing a swag

Q. Is she the reason you wanted to quit?

A. Yes.

Q. And you told David Franklin that?

A. Yes. I told Bob Crane first, and he took me up to talk to David. (II: 34–37).[31]

As defendant Franklin testified:

A. Ocie Parsley came up another time and she gave me notice that she was quitting. . . . She said she could not get along with Mrs. Taylor and that life was too short. She would put in her resignation at that time if something wasn't done.

Q. Did she tell you what she meant by that?

A. She meant she would not work there if Mrs. Taylor did. (188)

It thus becomes important to note that Ms. Parsley, who had worked for defendant four or five years longer than had plaintiff (176), was described by defendant Franklin as his most faithful, skillful, and valuable female employee in the specialty department (198), as a "key employee" (205), and as more valuable to the company than plaintiff (198).

Bob Crane summarized plaintiff's inability to get along with her co-workers thus:

At that time Martha was having difficulty getting along with several of the other women in the department. . . . It was causing me problems as far as being able to perform my duties. She was not able to, I guess, get along with a couple of the women, or one of them in particular at that time. . . . And it got to the point where I had to do something to keep peace and order in the department. That was when I went and talked to Mr. Franklin and told him the problem I was having. He asked what I felt should be done, and I said, well, I feel we ought to get rid of her. (II: 7)

Mr. Crane further testified that his feeling that defendant Franklin should terminate plaintiff had nothing whatever to do with her filing the EEOC complaint but, rather, was based on what he perceived to be in the best interest of the company (II: 7).

■ While there is credible evidence from which the Court could infer that defendant was not unmindful of plaintiff's EEOC complaint when the decision was

---

31. The testimony revealed other instances of plaintiff's disruptive conduct. Mr. Sloan, who was employed by defendant to handle accounting, purchasing, and payroll work, testified to an incident he had had with plaintiff:

I came to work one morning and went back toward the lunchroom, and she came upstairs and in an angry fashion told me that the ladies' restroom downstairs was filthy and that the ladies' restrooms upstairs were kept clean, and she thought it was my responsibility to make sure that her bathroom downstairs, the women's bathroom downstairs, was clean. And she was very angry and she jumped on me in front of about five or six people. (II: 89)

Upon filing her charge with the EEOC, plaintiff again drew the attention of her fellow employees to herself. As Ms. Parsley testified:

Q. How did you find out about it [plaintiff's filing of her first EEOC complaint]?

A. Well, she went upstairs, and I think Bob Crane went with her. And she came back and she clapped her hands like this (indicating) and said, "Come here, everybody." So I went over and she said, "I am suing David and Joyce." And it shocked me. I said, "What?" She told me again, and I walked back to the machine where I was working. And she asked me if I didn't have anything to say, wasn't I going to say anything. And I said I didn't have anything to say.

Q. How do you mean she clapped her hands? To get your attention, you mean?

A. Yes.

Q. Did she get everybody's attention?

A. Yes.

Q. And she made the announcement?

A. Yes. Then she talked all afternoon about it, but I did not listen because, like I said, it shocked me. (II: 38)

made to terminate her,[32] the Court, upon reviewing all the evidence, finds that plaintiff's filing of her complaint with the EEOC was not a "substantial factor" or a "motivating factor" in defendants' decision to fire her. *See Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). If it were assumed that plaintiff's filing her EEOC complaint was a substantial or motivating factor in defendants' decision to fire her, the evidence persuades the Court that defendants would have terminated plaintiff even in the absence of her protected conduct. Because of this, plaintiff cannot prevail on her retaliatory firing claim. *Mt. Healthy City Board of Education, supra*, 429 U.S. at 284–87, 97 S.Ct. at 574–76, 50 L.Ed.2d at 482–84; *Village of Arlington Heights, supra*, 429 U.S. at 270, 97 S.Ct. at 566, 50 L.Ed.2d at 468, fn. 21; *East Texas Motor Freight v. Rodriquez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453, 462, fn. 9 (1977); *Williams v. Day*, 553 F.2d 1160, 1162–63 (8th Cir. 1977); *Ayers v. Western Line Consolidated School District*, 555 F.2d 1309 (5th Cir. 1977).[33]

## V.

## CONCLUSION

For the above-stated reasons, it is hereby ORDERED that defendant corporation be, and it is hereby, directed to reimburse plaintiff for the employee portion of the premiums paid by plaintiff for the medical insurance she procured through defendant corporation; it is further

ORDERED that plaintiff be, and she is hereby, awarded all reasonable attorney's fees she incurred in prosecuting that portion of this suit on which she prevailed, and that defendant corporation be, and hereby is, directed to pay same; it is further

ORDERED that plaintiff's claims against defendant corporation in all other respects, be and hereby are, denied; it is further

ORDERED that all claims made by plaintiff against defendant David Franklin individually be, and they hereby are, denied.

---

**32.** The credible evidence to which the Court refers is Ms. Toliver's testimony that defendant Franklin told her: "I can't fire her [plaintiff], but if I can find a reason, I will" (112).

**33.** The test set forth in *Mt. Healthy* was perhaps best expressed by the Fifth Circuit in *Ayers, supra*, at 1314, where the Court stated:

> According to *[Mt. Healthy City School District Board of Education v.] Doyle*, a plaintiff in a case such as this has the initial burden to show (1) that his conduct was constitutionally protected, and (2) that this conduct was a "substantial factor" or a "motivating factor" in the school board's decision. . . . If the plaintiff meets that burden, the board can avoid liability only through proof by a preponderance of the evidence that it would have reached the same decision without regard to the protected conduct.

The rationale for this test was expressed by the *Mt. Healthy* Court, 429 U.S. at 285, 97 S.Ct. at 575, 50 L.Ed.2d at 482–83, thus:

> A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.